Revised June 3, 1999

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-41388
_____

JOY NIDAY COLSON,

                         Plaintiff-Appellant,

v.

PAUL GROHMAN; MIKE HOGG; JACK ROBERTS;
STELLA ROBERTS; CITY OF PEARLAND,

                         Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

April 26, 1999

Before KING, Chief Judge, and JONES and SMITH, Circuit Judges.

KING, Chief Judge:

    Plaintiff-appellant Joy Niday Colson appeals from the

district court's grant of summary judgment in favor of

defendants-appellees Paul Grohman, Mike Hogg, Jack Roberts,

Stella Roberts, and the City of Pearland.  Colson, an elected

official, alleges that defendants-appellees falsely accused her

of criminal acts, urged prosecutors to investigate her, and

instigated a recall election against her because they disagreed

with her political views and votes.  Such retaliation, she

1

asserts, violates her rights under both the First and Fourteenth Amendments. We find that the retaliatory criticism, investigations, and false accusations to which Colson maintains she was subjected are not actionable under the First Amendment. Because Colson's Fourteenth Amendment claim rests on a theory that defendants-appellees both harmed her reputation and deprived her of her constitutional right to speak without retaliation, it is foreclosed by our conclusion that she has suffered no actionable First Amendment harm. Accordingly, we affirm the district court's grant of summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Because the precise nature of the harms suffered by a plaintiff claiming First Amendment retaliation is crucial to our determination of whether she has alleged a constitutional deprivation, we describe in detail the long and tortured history of this case. Plaintiff-appellant Joy Niday Colson, whose husband, Bill Colson, was a police officer in Pearland, Texas (the City), won a seat on the Pearland City Council (the Council) in May 1991. At that time, the other members of the Council were Benny Frank, D.A. Miller, Randy Weber, and Billy Wolff, who in May 1992 was replaced by David Smith. In the late summer or early fall of 1992, defendant-appellee Phillip Michael Hogg, the Pearland Police Department (PPD) Police Chief, presented his proposed PPD budget for 1993, including a pay plan for PPD

2

employees, to the Council for adoption. Colson offered an alternative proposal (the Colson Pay Plan) that called for eliminating one of four PPD corporal positions, hiring two clerks to fill that position, and assigning two clerks to administrative duties so that another officer would be free to patrol the streets. Hogg and defendant-appellee Paul Grohman, Pearland's City Manager, opposed the Colson Pay Plan. On December 14, 1992, over Hogg's objections, the Council voted unanimously to abolish the corporal position.

According to Colson, Hogg then began using the powers of his office to retaliate against her for her opposition to his proposed budget. On January 7, 1993, Hogg submitted to Brazoria County District Attorney Jim Mapel a "confidential investigation" memorandum detailing numerous instances in which certain Pearland City Council members, including Colson, allegedly violated state open meetings or conflict-of-interest statutes. Hogg allegedly related at least two incidents that he admitted he knew did not constitute crimes. First, based on a conversation he had with Council member Benny Frank in February 1992, Hogg suggested that Colson violated the Texas Open Meetings Act (TOMA) by meeting secretly to conspire to terminate then-City Manager James DeShazer. Hogg admitted in the memorandum, however, that City Attorney Lester Rorick had informed him that Colson had committed no crime because a Council quorum had not been present at the allegedly illegal meetings. Hogg also noted that in 1981 and

3

1983, Bill Colson offered two other PPD officers compensation in exchange for their resigning from PPD sergeant positions so that he could be promoted more quickly, a practice that Colson claims Hogg knew was legal at the time. Although it was unusual for the District Attorney's Office to investigate such allegations, Mapel assigned Assistant District Attorney Tom Selleck to the case because of Hogg's status as Police Chief.

Colson claims that over the next few months, Hogg became increasingly frustrated by her positions on PPD issues and retaliated against her by making more false criminal accusations. First, on May 8, 1993, Hogg prepared a confidential report alleging that Colson had violated TOMA and the state nepotism statute. Some two weeks later, Hogg prepared another update accusing Colson of improperly proposing that the Council reconsider its earlier decision to discontinue disability coverage for city employees in an effort to benefit her husband, who had contracted a disabling illness. Hogg also noted:

> I must add, that I am very concerned that this matter is taking so long to address. I delivered the information to Mr. Maples [sic] on January 7, 1993. Some of the subjects in this matter have been contacted, and rumors are flying. I feel that postponing actions may jeopardize this case totally.

Hogg delivered both reports to Selleck.

In response, Selleck told Hogg that if he could prove that three TOMA violations had occurred within the preceding twelve months, Selleck would take the allegations to the Brazoria County

4

grand jury.  In June 1993, however, Selleck informed Mapel that there was no basis for bringing criminal charges against the Council members.  Selleck and Mapel also discussed their concern that Hogg was attempting to use the District Attorney's Office in a personal battle with Colson and other Council members.  Mapel informed Hogg on June 15, 1993, that no action would be taken with respect to his allegations.  Hogg claims that Mapel acknowledged that the Council members had committed "technical violations" of TOMA but considered these too minor for prosecution.  The record, however, contains no other evidence that Mapel said any such thing.

At around the same time, Council member Weber requested a Council meeting to evaluate Hogg, and City Manager Grohman confided to Hogg that Colson, Miller, and Weber wanted to terminate Hogg.  On June 21, 1993, the Council, with Colson absent, met in a public session for the express purpose of evaluating Hogg.  Hogg read a prepared statement suggesting that the Council, in violation of TOMA and the City Charter, had decided at a private retreat not to approve any raises for police officers for fiscal year 1994.  On or about July 13, Hogg filed a probable cause affidavit claiming that Miller had committed official misconduct by accepting pay from a public university while also drawing a salary from the City.  Three days later, Hogg met with Selleck and Brazoria County Investigator John Blankenship and provided them with a chart of violations that

Council members allegedly had committed between July 1, 1992 and July 12, 1993. The chart indicated that Colson had violated TOMA and the state nepotism statute by participating in illegal meetings and voting on a matter directly affecting her husband.

On July 19, 1993, in a closed executive session, the Council evaluated Grohman. Smith and Weber rated Grohman favorably, while Frank gave him an average score. Miller described Grohman's performance as poor, as did Colson, who criticized him for "manag[ing] with intimidation" and awarding salary increases without Council approval. At the end of the meeting, Miller and Frank requested that the Council consider terminating Grohman at its next meeting, on July 26, 1993.

Colson alleges that a furious Grohman asked Hogg to prepare recall petitions for the Council members who had criticized him, which Hogg did.[1] The petition for Colson contained the following allegations, even though the district attorney already had

---

[1] In their City Charter, the people of Pearland have reserved the power to recall city officials from office. To invoke the process, a specified number of the electorate must file a recall petition alleging one or more specified "grounds" for recall, i.e., incompetency, misconduct, or malfeasance in office. Five days after a petition has been filed, the City Secretary must either certify it if it is in proper form or return it to the petitioners for correction. If it is certified, the City Secretary must then present the petition to the Council. Within five days after a petition has been presented, the accused official may request "that a public hearing be held to permit him/her to present facts pertinent to the charges specified in the recall petition," and, within fifteen days of such a request, the Council must order a recall election wherein the voters decide whether the accused official should be removed from office.

6

declined to bring charges:

> Directed to the City Council in and for the City of Pearland for the specific purpose of demanding the recall of Joy Colson, who is a duly elected Council member of the City Council in and for the City of Pearland . . . . Pursuant to Section 6.02 of the City of Pearland Charter, the below signed qualified voters do hereby demand the recall of Council Member Colson on the grounds of Malfeasance in Office.
>
> Specifically we allege that Ms. Colson, while acting as a city council member, did violate The City of Pearland Charter, Sections 8.06 and 8.07, and Chapter 171(1)d, of the Local Government Code there by [sic] violating a law relating to her office as a Council member, thus rendering her actions in violation of Section 39.01 of the State Penal Code titled Official Misconduct, the same being a Class A Misdemeanor. We further allege that Ms. Colson violated these sections by deciding on the final budget of the police department for fiscal year 94 without conducting the required Public Hearing and posting the required Public notice, further that on March 8, 1993 she participated in a vote that had a direct effect on her husband's position in the Police Department. We further allege that she regularly enters into deliberations concerning matters which have a direct impact on her husband.

Hogg delivered a copy of the Colson recall petition to two individuals who requested it, Grohman and another city employee, Paul Dillon, but to no one else. Grohman delivered a copy of the Colson recall petition to defendant-appellee Stella Roberts, a private Pearland citizen and former Council member, but to no one else. Grohman and Stella Roberts then prepared a set of instructions to accompany the petitions. These instructions stated that Colson was being investigated by the District Attorney's Office and a grand jury for possible criminal violations and accused her of (1) having shown a disregard for the laws governing the City; (2) having numerous allegations

7

lodged against her for acting illegally outside public meetings; (3) letting personal vendettas override public interest by persecuting the police chief, city manager, and other city employees; and (4) self-dealing. Colson contends that all of these allegations were false. The petitions were circulated during the July 26 Council meeting held to consider dismissing Grohman, at which a divided Council, with Colson, Miller, and Frank on one side and Smith and Weber on the other, decided to revisit the issue of Grohman's employment after ninety days.

On September 7, 1993, then-City Secretary Pat Jones received the petitions. On September 11, she determined that the signatures on the petitions lacked the necessary voter registration numbers. Grohman then contacted Stella Roberts, who picked up the petitions for correction, and directed City employees to assist Stella Roberts and her husband, defendant-appellee Jack Roberts, in correcting the petitions and to help Jones certify them. Grohman also ordered Jones to provide the Robertses with a City copy of the voter registration list so that they could more easily provide the registration numbers. On September 12, the Robertses returned the corrected petitions. Jones and the City Attorney determined, however, that many of the signatures were invalid because the petitions were not signed by the affiants claiming to have circulated them, as required by the City Charter. Grohman then personally telephoned the affiants, including Jack Roberts, and requested that they come to the City

8

Secretary's Office to sign the petitions they had circulated. Throughout this period, Jones asserts, Grohman pressured her to certify the petitions without verifying the signatures thereon and to complete the certification in time for the September 13 Council meeting. Jones ultimately refused to certify the petitions.

Following the return of the petitions, the Robertses, along with others, organized the circulation of a second set of recall petitions containing the same accusations against Colson that had been made in the first set of recall petitions. In addition to a new allegation of incompetence, the second set of petitions also alleged that Colson (1) committed malfeasance in office by regularly voting on matters directly affecting the compensation afforded her husband as a member of the PPD; (2) approved the 1994 budget for the PPD in violation of TOMA; and (3) effectively relegated her investigation and consideration of certain actions to be taken by the Council to Miller and Frank and then voted according to their direction or position. On October 4, 1993, Colson filed suit in state court seeking an injunction barring any recall election and continued publication of the allegedly false criminal allegations against her. On November 22, 1993, the state district court enjoined any recall election, finding that the petitions failed to give Colson adequate notice of the charges against her. No recall election ever occurred.

During and after the circulation of the first set of recall

petitions, Grohman and Hogg continued to report the Council's alleged criminal activity to the District Attorney's Office. On September 8, in a tape-recorded telephone conversation, Selleck told Hogg that he had met with Colson, Miller, Frank, and their lawyer and had informed the Council members that they had broken the law. He also stated that he had accused Colson personally of violating the state nepotism statute and committing criminal official misconduct. In early November 1993, Hogg prepared a presentation on the Council's alleged criminal activities for Sergeant Jim Harelson of the Texas Rangers. After the state district court enjoined the recall election on November 22, Stella Roberts telephoned Hogg to report that she had observed Colson engaged in conversations in the courtroom regarding matters that might have been pending before the Council and offered to speak to the District Attorney's Office. Hogg prepared a report to law enforcement authorities setting forth Roberts's allegations.

Grohman and Hogg also continued to ask the District Attorney's Office to bring charges against Colson. On November 23, 1993, Grohman complained to Mapel that Council members were retaliating against him and told Mapel that he understood that a grand jury would follow Mapel's recommendation. Mapel denied this. Grohman also stated that an indictment for retaliation or coercion was the only thing that would make Colson and the other Council members "run the other way." Hogg attempted to pressure

10

Mapel to indict Colson by forwarding to him a copy of a letter criticizing Colson from his friend and political ally Reverend Scarborough of the First Baptist Church of Pearland, accompanied by a cover letter stating that the First Baptist congregation had 1800 members. Finally, in December 1993, Hogg, Selleck, Blankenship, and Texas Ranger Joe Harelson met in Blankenship's office at the Brazoria County District Attorney's Office, where Hogg asked Selleck to bring criminal retaliation or coercion charges against Colson because she had voted to have Grohman investigated. Selleck told Hogg that he did not have sufficient grounds to bring such charges. After Hogg continued pressuring Selleck to bring the allegations before the grand jury, Selleck warned Hogg that he was "coming close to trampling" on Colson's constitutional rights. Several days after this meeting, Hogg told Selleck that if he could get Colson, Frank, and Miller indicted, he would guarantee him 1800 votes if Selleck ran to succeed Mapel as District Attorney in the upcoming election. Selleck told Hogg that he had no interest in running for District Attorney. Following this meeting, according to Colson, Selleck and Blankenship concluded that Hogg had lost his focus as an impartial and objective criminal investigator and forgotten his mission as the City's chief law enforcement officer. They also discussed, but rejected, bringing bribery charges against him.

On January 12, 1994, Hogg testified before the grand jury. He accused Colson of retaliation and coercion of a public

servant, despite being told by Selleck not to present such allegations because the elements of these offenses could not be met.  He also asked the grand jury to indict Colson for a violation of the nepotism statute and TOMA despite, Colson claims, his awareness that she had the right to vote on matters involving bona fide classes of employees that included her husband and that the Council had held a public hearing on the PPD budget.  Following Hogg's presentation, the grand jury declined to indict Colson and found no probable cause to believe that either the nepotism or conflict of interest statutes had been violated.  On February 3, 1994, Hogg wrote to Harelson, asking that Selleck be investigated for his failure to take action on Hogg's allegations.

On March 23, 1994, Assistant District Attorney Danette Holcombe informed Grohman that the grand jury had considered Grohman's retaliation and coercion charges and brought back a no-bill on both.  Grohman again claimed that he was being retaliated against "by three of them.  I can't prove it but on two because Mrs. Colson is always very careful not to be the one that signs the documents.  It's always Miller and Frank . . . ."  Holcombe informed Grohman that several members of the Brazoria County District Attorney's Office had reviewed the case and had not found that anyone had retaliated against or coerced Grohman.

On or about April 14, 1994, just two weeks before the May 1994 election in which Colson was running for reelection, Hogg

12

prepared, on City time and using City property, a lengthy report on PPD stationery entitled "Pearland Pandemonium, or 'It's OK, everybody does it'" and directed the City Secretary's Office to forward it to the public library.  The purpose of the report, Hogg claimed, was to give the Council an accounting of events as it considered Grohman's employment status; nevertheless, he admitted that he had it placed in the library because he "wanted it in the public forum."  While Hogg represented the report to be a complete chronology of events relating to criminal investigations of all Council members, it targeted only Colson, Frank, and Miller.  Hogg attributed his failure to include allegations against any of the other Council members as "due to [his] style of writing."

In May 1994, Colson lost her reelection bid by a wide margin.  She continued to pursue a state court action for defamation, libel, and due process violations against, among others, the Robertses; in August 1994, she added Hogg and Grohman as defendants.  In May 1995, Colson filed an amended petition alleging claims under 42 U.S.C. § 1983 for violations of her rights under the First and Fourteenth Amendments.[2]  Hogg,

_____

[2]  Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party

13

Grohman, the Robertses, and the City of Pearland (collectively, defendants) removed the case to the United States District Court for the Southern District of Texas pursuant to 28 U.S.C. § 1441(a) & (b), where it was assigned to a magistrate judge, and Colson filed several amended petitions.  Her Seventh Amended Original Petition, the live pleading in this case, alleges a "deliberate and calculated campaign undertaken by the Defendants, conspiring together, to remove her from office and to destroy her reputation and good standing in the Pearland community in direct retaliation for [her] efforts to speak out and vote on matters of public concern."  The petition contains five counts: (1) Defendants, acting under color of state law, wilfully, knowingly, and maliciously conspired to intimidate and retaliate against Colson, in her capacity as an elected official and as a citizen, for her efforts to speak out and vote freely on matters of public concern, and their malicious actions did, in fact, deny Colson her First Amendment rights as secured by the Constitution and 42 U.S.C. § 1983; (2) defendants, acting under color of state law, wilfully, knowingly, and maliciously conspired to publicize false

---

    injured . . . .

42 U.S.C. § 1983.  Section 1983 creates a private right of action for redressing the violation of federal law by those acting under color of state law.  See Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 82 (1984).  It is not itself a source of substantive rights, but merely provides a method for vindicating federal rights conferred elsewhere.  See Albright v. Oliver, 510 U.S. 266, 271 (1994).

14

and defamatory statements about Colson in connection with their efforts to remove her from public office through their initiation of recall proceedings, and these statements stigmatized Colson and cast her in a false light, thereby denying Colson her Fourteenth Amendment rights as secured by the Constitution and 42 U.S.C. § 1983; (3) defendants made false statements with reckless disregard for the truth or actual knowledge of their falsity, "in an effort to retaliate and injure Colson and her political associates," and these statements constitute actionable slander, libel, and libel per se under Texas Civil Practice & Remedies Code § 73.001; (4) defendants' actions constitute intentional infliction of emotional distress on Colson; and (5) defendant Hogg caused the commencement of criminal prosecutions against Colson and her political associates, "knowingly making false and misleading charges in retaliation for Colson speaking out on matters of public concern involving the PPD and Grohman." Colson claims damages for "shame, embarrassment, humiliation, and mental pain and anguish," as well as injury to her "good name and reputation," loss of her Council position, and exposure to "hatred, contempt, and the ridicule of the general public, as well as her friends and relatives."

All defendants filed motions for summary judgment. With respect to Colson's § 1983 claims, they contended that she had failed to allege any deprivation of a cognizable constitutional right. Colson filed a response, arguing that she had stated

(1) an actionable First Amendment free speech claim because she had alleged that defendants misused the recall and criminal justice processes to retaliate against her for her constitutionally protected speech, and (2) an actionable Fourteenth Amendment liberty interest claim because she had alleged that the defendants injured her reputation and deprived her of "her First Amendment right to speak out on matters of public concern while she was a Council member, free from retaliation by defendants."  The magistrate judge issued a report recommending that summary judgment be denied on the First Amendment issue but granted on all other claims.  The district court, however, declined to accept the recommendation, granted defendants' motions for summary judgment on the First and Fourteenth Amendment claims, and dismissed those claims.[3]  Colson appealed.

## II.  STANDARD OF REVIEW

We review the entry of summary judgment de novo, see Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998), applying the same standards as the district court, see Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc., 831 F.2d 77, 79 (5th Cir. 1987).  After consulting applicable law in order to

---

[3]     The district court then ordered that the First and Fourteenth Amendment claims be severed from the remaining claims pursuant to Federal Rule of Civil Procedure 54(b).  Because only matters of state law remained, the court declined to exercise supplemental jurisdiction and remanded the remaining claims to the district court of Brazoria County, Texas.

16

ascertain the material factual issues, we consider the evidence bearing on those issues, viewing the facts and the inferences to be drawn therefrom in the light most favorable to the non-movant. See King v. Chide, 974 F.2d 653, 656 (5th Cir. 1992). The party moving for summary judgment has the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the summary judgment record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once that burden is met, the burden of production shifts to the non-movant to demonstrate that a genuine issue of fact does exist on the material elements of his claims. See id. at 323-24. Summary judgment is properly granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

### III. DISCUSSION

On appeal, Colson asserts that defendants violated her First Amendment rights by misusing the criminal justice and recall processes to retaliate against her for her speech on matters of public concern. Specifically, she claims, defendants knowingly (1) reported baseless accusations to the District Attorney's Office in an effort to have her prosecuted; (2) used these

17

allegations as the basis of a recall petition to drive her out of office; and (3) repeated them once again in a public document designed to discredit her with her constituents. Such retaliation by city officials, Colson argues, constitutes a deprivation of her First Amendment rights under color of state law and is therefore actionable under 42 U.S.C. § 1983. Defendants respond that, even taking Colson's complaint as true, their actions resulted only in injury to Colson's reputation, which is not actionable under the Constitution, especially where the plaintiff is, like Colson, an elected policymaker alleging that her opponents' politically motivated defamation chilled her expression.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I. Although it explicitly refers only to federal action, it applies to the states through the Due Process Clause of the Fourteenth Amendment. See De Jonge v. Oregon, 299 U.S. 353, 364 (1937). There is no question that political expression such as Colson's positions and votes on City matters is protected speech under the First Amendment. See Connick v. Myers, 461 U.S. 138, 145 (1983) ("[T]he Court has frequently reaffirmed that speech on public issues occupies the highest rung of the

18

heirarchy [sic] of First Amendment values and is entitled to special protection.") (internal quotation marks omitted); First Nat'l Bank v. Bellotti, 435 U.S. 765, 776 (1978) (stating that speech on matters of public concern is "at the heart of the First Amendment's protection"); Rash-Aldridge v. Ramirez, 96 F.3d 117, 119 (5th Cir. 1996) (citing Miller v. Town of Hull, 878 F.2d 523, 532 (1st Cir. 1989)).

We turn first to defendants' argument that Colson cannot claim First Amendment protection against their alleged retaliation because she was a public official.  They assert that just as the Pearland electorate as a whole did not violate Colson's constitutional rights by voting her out of office because of her political speech, no individual citizen could violate her constitutional rights by publicly criticizing her official actions, trying to remove her from office through the use of statutory procedures, attempting to have her criminally investigated for official misconduct, and campaigning to oust her from office.  Cf. Zilich v. Longo, 34 F.3d 359, 363 (6th Cir. 1994) (holding that a "pattern of retaliatory voting and official legislative action" does not violate the First Amendment and that "[t]he First Amendment is not an instrument designed to outlaw partisan voting or petty political bickering through the adoption of legislative resolutions").

Defendants are certainly correct that criticism of public officials lies at the very core of speech protected by the First

19

Amendment.  See New York Times Co. v. Sullivan, 376 U.S. 254,

269-70 (1964) (stating that this country enjoys "a profound

national commitment to the principle that debate on public issues

should be uninhibited, robust, and wide-open, and that it may

well include vehement, caustic, and sometimes unpleasantly sharp

attacks on government and public officials").  Even charges of

criminal conduct against an official or candidate are

constitutionally protected unless they are made with knowledge of

their falsehood or with reckless disregard of whether they are

false or not.  See Monitor Patriot Co. v. Roy, 401 U.S. 265, 277

(1971).  But intentional or reckless falsehood, even political

falsehood, enjoys no First Amendment protection:

> At the time the First Amendment was adopted, as today, there
> were those unscrupulous enough and skillful enough to use
> the deliberate or reckless falsehood as an effective
> political tool to unseat the public servant or even to
> topple an administration. . . . That speech is used as a
> tool for political ends does not automatically bring it
> under the protective mantle of the Constitution.  For the
> use of the known lie as a tool is at once at odds with the
> premises of democratic government and with the orderly
> manner in which economic, social, or political change is to
> be effected.

McDonald v. Smith, 472 U.S. 479, 487 (1985) (quoting Garrison v.

Louisiana, 379 U.S. 64, 75 (1964)) (holding that a state may

constitutionally award damages for libelous letters to the

President falsely accusing a potential appointee of criminal

misconduct).  Taken in the light most favorable to the non-

movant, the summary judgment record in this case shows that the

defendants not only criticized Colson but defamed and libeled

20

her, presenting criminal allegations to the District Attorney's Office and the public with knowledge that they were false or with reckless disregard of whether they were false or not.[4] Therefore, defendants' speech enjoys no First Amendment protection, and they cannot argue that protected First Amendment activity cannot violate the First Amendment rights of others.

Defendants respond, however, that even assuming their allegations were knowingly false, the First Amendment does not protect policymaking officials from dismissal or other sanctions because of their speech. In support of this argument, they cite Romero-Barcelo v. Hernandez-Agosto, 75 F.3d 23 (1st Cir. 1996). In Romero-Barcelo, a former governor of Puerto Rico brought a § 1983 action against the President of the Puerto Rico Senate, the head of the Senate Judiciary Committee, and the Senate's chief counsel. He claimed that the defendants and the Judiciary Committee itself continuously labeled him an assassin or murderer because of his beliefs and political association, even though no

---

[4] Selleck stated in his affidavit that he told Mapel as early as June 1993 that there was no basis for bringing criminal charges against the Council members and that Mapel told Hogg that his office would take no action. He also testified that Hogg and Grohman accused Miller of illegally receiving a salary from two governmental entities at the same time, without revealing that it was Grohman who had suggested that he do so. Blankenship stated in his affidavit that Hogg offered Selleck 1800 votes for District Attorney if he convinced the grand jury to indict Colson, Miller, and Frank. Hogg himself admitted in deposition testimony that he prepared recall petitions even though he knew that it was improper for him to do so and that it was unusual for him to become personally involved in criminal investigations.

evidence was ever submitted to substantiate the charge; that one defendant presented information about him to the Committee and the press knowing it to be false or misleading; and that the defendants disseminated false information about him.  See id. at 27-28.  The First Circuit determined that the governor had failed to state an actionable claim because there is "no First Amendment protection for a politician whose rights to freedom of speech, freedom of association, and freedom to disassociate [oneself] from unpopular views have been injured by other politicians seeking to undermine his credibility within his own party and with the electorate."  Id. at 34 (quoting Barcelo v. Agosto, 876 F. Supp. 1332, 1348 (D.P.R. 1995)) (internal quotation marks omitted) (alteration in original).  Because Romero-Barcelo was a policymaker, the court held, Elrod v. Burns, 427 U.S. 347, 357 (1976) (plurality opinion), and Branti v. Finkel, 445 U.S. 507, 517 (1980), foreclosed his First Amendment retaliation claim. See Romero-Barcelo, 75 F.3d at 34.

Even if we wished to do so, we are not free to adopt the First Circuit's position.  At least twice, this court has granted relief to elected officials claiming First Amendment retaliation. See Scott v. Flowers, 910 F.2d 201, 213 (5th Cir. 1990) (holding that the Texas Commission on Judicial Conduct could not constitutionally reprimand an elected state justice of the peace for making public statements criticizing other county officials); Smith v. Winter, 782 F.2d 508, 512 (5th Cir. 1986) (finding that

22

elected members of a county board of education stated an actionable First Amendment retaliation claim).  We are compelled to obey this binding precedent.

Moreover, with respect to the First Circuit's reasoning, there is a viable counterargument that Elrod and Branti do not exclude policymaking officials from all First Amendment protection.  Elrod and Branti held that the state may dismiss a government employee on the basis of his political beliefs only if (1) those beliefs would interfere with the discharge of his official duties, and (2) the state can show that dismissal is a narrowly tailored means of achieving an interest of vital importance.  See Branti, 445 U.S. at 517 & n.12; Elrod, 427 U.S. at 362-63.  In Romero-Barcelo's case, the argument would go, the defendants could have shown neither, for an elected legislator's expression of his political beliefs is absolutely necessary for, rather than detrimental to, the discharge of his official duties, and at any rate the state has no compelling interest in suppressing such speech.  See Bond v. Floyd, 385 U.S. 116, 135-36 (1966) ("The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy.").  Thus, one could contend, Elrod and Branti do not sanction retaliation against a public official for the exercise of First Amendment rights.

Ultimately, however, this case does not require us to

23

confront <u>Romero-Barcelo</u> or our prior precedents, as Colson has not suffered harms rising to the level of actionable retaliation. We next explain why.

As a general rule, the First Amendment prohibits not only direct limitations on speech but also adverse government action against an individual because of her exercise of First Amendment freedoms. For example, the government may not place conditions on public benefits, including jobs, that penalize applicants for their speech, beliefs, or association. See <u>Pickering v. Board of Educ.</u>, 391 U.S. 563, 574-75 (1968) (holding impermissible under the First Amendment the dismissal of a high school teacher for speaking on "issues of public importance"); <u>Sherbert v. Verner</u>, 374 U.S. 398, 409-10 (1963) (holding that unemployment compensation may not be withheld on the condition that a person accept Saturday employment contrary to her religious faith); <u>Torcaso v. Watkins</u>, 367 U.S. 488, 495-96 (1961) (holding that a citizen cannot be refused a public office for failure to declare his belief in God); <u>Speiser v. Randall</u>, 357 U.S. 513, 528-29 (1958) (prohibiting on First Amendment grounds the limiting of state tax exemptions to only those who take a loyalty oath); <u>cf.</u> <u>Cafeteria & Restaurant Workers Union, Local 473 v. McElroy</u>, 367 U.S. 886, 898 (1961) (recognizing that the government cannot deny employment because of previous membership in a particular political party). This is true even where the person has no contractual or property right in the benefit withheld. See <u>Mt.</u>

24

Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 285 (1977) (holding that an untenured public school teacher may not be discharged if he shows that constitutionally protected conduct was a "substantial" or "motivating" factor in the decision not to rehire him and the employer fails to demonstrate that it would have reached the same decision even in the absence of the protected conduct); Perry v. Sindermann, 408 U.S. 593, 599 (1972) (holding that an untenured teacher's lack of formal contractual or tenure security in his job was irrelevant to his First Amendment claim that his employer, a state college, refused to renew his contract because of his protected speech).

Similarly, the Supreme Court has recognized limitations on patronage--that is, government officials' power to make employment decisions on the basis of an individual's political affiliation--in Elrod, 427 U.S. at 373, Branti, 445 U.S. at 517, and Rutan v. Republican Party, 497 U.S. 62, 75 (1990). In Elrod, the Court held that "the practice of patronage dismissals is unconstitutional under the First and Fourteenth Amendments . . . ." 427 U.S. at 373. In Branti, the Court clarified that the Elrod rule applies unless the "hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518. Finally, in Rutan, the Court announced that Elrod and Branti apply not only to patronage dismissals but also to patronage promotions, transfers,

and recalls after layoffs.  <u>See</u> 497 U.S. at 75.  The Court has also extended <u>Elrod</u>, <u>Branti</u>, and <u>Rutan</u> to government retaliation against a contractor or a regular provider of services for the exercise of rights of political association and the expression of political allegiance.  <u>See</u> <u>O'Hare Truck Serv., Inc. v. City of Northlake</u>, 518 U.S. 712, 720 (1996); <u>Board of County Comm'rs v. Umbehr</u>, 518 U.S. 668, 685-86 (1996).  While <u>Rutan</u> and its progeny addressed only political patronage, we have also applied it to cases involving public employer retaliation for employees' exercise of their free speech rights.  <u>See</u> <u>Brady v. Fort Bend County</u>, 145 F.3d 691, 703 (5th Cir. 1998) (citing <u>Click v. Copeland</u>, 970 F.2d 106, 110-11 (5th Cir. 1992)), <u>cert. denied</u>, 119 S. Ct. 873 (1999).

But why is such retaliation against the exercise of First Amendment rights itself a violation of the First Amendment?  The Supreme Court has asserted that imposing penalties for speech, belief, and association chills the exercise of First Amendment freedoms and thereby indirectly produces a result that the government cannot command directly:

> For at least a quarter-century, this Court has made it clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely.  It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests--especially, his interest in freedom of speech.  For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.  This

26

would allow the government to "produce a result which [it] could not command directly." Such interference with constitutional rights is impermissible.

Perry, 408 U.S. at 597 (citation omitted). Thus, in Pickering, the Court noted that while not a criminal sanction or damage award, "it is apparent that the threat of dismissal from public employment is nonetheless a potent means of inhibiting speech," 391 U.S. at 574, and observed in Elrod that "[t]he cost of the practice of patronage is the restraint it places on freedoms of belief and association," 427 U.S. at 355. Similarly, the Court justified its extension of Elrod to the patronage promotions, transfers, and recalls after layoffs at issue in Rutan by pointing out that "there are deprivations less harsh than dismissal that nevertheless press state employees and applicants to conform their beliefs and associations to some state-selected orthodoxy."[5] Rutan, 497 U.S. at 75. And in O'Hare, the Court

_____

[5] The Court pointed out:

Respondents next argue that the employment decisions at issue here do not violate the First Amendment because the decisions are not punitive, do not in any way adversely affect the terms of employment, and therefore do not chill the exercise of protected belief and association by public employees. This is not credible. Employees who find themselves in dead-end positions due to their political backgrounds are adversely affected. They will feel a significant obligation to support political positions held by their superiors, and to refrain from acting on the political views they actually hold, in order to progress up the career ladder. Employees denied transfers to workplaces reasonably close to their homes until they join and work for the Republican Party will feel a daily pressure from their long commutes to do so. And employees who have been laid off may well feel compelled to engage in whatever political activity

27

concluded that a municipal government's termination of a commercial relationship with an independent contractor because of his speech constituted, like the dismissal in Perry, a "burden on an individual's right of political association," 518 U.S. at 720, and an "attempted coercion of [the contractor's] political association, enforced by a tangible punishment," id. at 721.

But it does not follow that all disadvantages imposed for the exercise of First Amendment freedoms constitute actionable retaliation.  To be sure, the Supreme Court has suggested in dicta that even the most trivial retaliatory harassment is actionable.  In Rutan's famous footnote 8, the Court stated: "The First Amendment, as the court below noted, already protects state employees not only from patronage dismissals but also from 'even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights.'"  497 U.S. at 76 n.8 (quoting Rutan v. Republican Party, 868 F.2d 943, 954 n.4 (7th Cir. 1989)).  The lower court in Rutan, however, was in turn characterizing its own decision in Bart v. Telford, 677 F.2d 622 (7th Cir. 1982), which in fact held that trivial actions would be actionable only if they formed part of a campaign of retaliatory harassment.  See Rutan, 868 F.2d at 954 n.4.  And although the

is necessary to regain regular paychecks and positions corresponding to their skill and experience.

Rutan, 497 U.S. at 73 (footnotes omitted).

Court stated in Elrod that "the inducement afforded by placing conditions on a benefit need not be particularly great in order to find that rights have been violated," 427 U.S. at 359 n.13, it thereby also implied that some inducements may fall short even of that mark. It follows, therefore, that there may be some minor adverse actions that would not constitute First Amendment violations. See Sharp v. City of Houston, 164 F.3d 923, 933 (5th Cir. 1999) ("Although the Supreme Court has intimated that the First Amendment protects against trivial acts of retaliation, this court has required something more than the trivial."); see also Scott, 910 F.2d at 216 n.32 (Garwood, J., dissenting) ("I believe it would be a serious mistake to take literally the Supreme Court's apparently off-hand dicta about birthday parties in footnote 8 of Rutan. In the body of the opinion in Rutan, the Court stressed that the case before it involved 'significant penalties . . . imposed for the exercise of rights guaranteed by the First Amendment.'" (citation omitted)).

Accordingly, this circuit has held that "[a]lthough some actions may have . . . the effect of chilling [the plaintiff's] protected speech, they are not actionable." Pierce v. Texas Dep't of Criminal Justice, Inst. Div., 37 F.3d 1146, 1150 (5th Cir. 1994). In Pierce, the plaintiff alleged that she was investigated once for "trafficking" and once for a verbal altercation. We found these incidents non-actionable under the First Amendment because "[n]either investigation resulted in any

29

action being taken against Pierce." Id. Similarly, we have held that a law school dean's criticism, without more, of certain professors was not actionable:

> [A]ssuming that Douglas did, in fact, criticize Kleven's [law school] participation as being counterproductive, Plaintiffs point to no case law (nor do we find any) which holds that an employer's criticism of an employee, without more, constitutes an actionable adverse employment action. In this case, the evidence is clear that no Plaintiff has been discharged or threatened with discharge; no Plaintiff has been demoted; no Plaintiff has been denied a promotion; and no Plaintiff has suffered a reduction in pay. In fact, all Plaintiffs are tenured professors of law, having achieved the highest rank available at the law school. All Plaintiffs still teach at the law school and all Plaintiffs are among the law school's top earners. Regardless of the arguable merits behind this, or any criticism, mere criticisms do not give rise to a constitutional deprivation for purposes of the First Amendment. Accordingly, Plaintiffs did not suffer an actionable adverse employment action when Douglas criticized Kleven as being counterproductive.

Harrington v. Harris, 118 F.3d 359, 366 (5th Cir.), cert. denied, 118 S. Ct. 603 (1997). Likewise, in Benningfield v. City of Houston, 157 F.3d 369, 376 (5th Cir. 1998), cert. denied, 119 S. Ct. 1457 (1999), we held that false accusations, verbal reprimands, and investigations were not actionable adverse employment actions. Formal reprimands, however, do qualify as adverse employment actions and, when given in retaliation for First Amendment activity, are actionable. See Harris v. Victoria Indep. Sch. Dist., 168 F.3d 216, 220 (5th Cir. 1999); Pierce, 37 F.3d at 1149.

We now turn to Colson's allegations. We first emphasize what did not happen: Colson was never arrested, indicted, or

30

subjected to a recall election.[6]  Nor was she formally

reprimanded.  This last fact distinguishes her case from Scott,

in which we found that a single formal public reprimand of a

judicial official in retaliation for his exercise of First

Amendment rights was actionable under § 1983.  Scott, an elected

state justice of the peace, wrote an open letter criticizing

other county officials.  See Scott, 910 F.2d at 204 & n.2.  The

Texas Commission on Judicial Conduct publicly reprimanded him.

See id. at 204, 205 n.6.  After first acknowledging Scott's good

intentions and personal integrity, the Commission chided him for

being "insensitive" and urged him to be "more restrained and

temperate in written and oral communications in the future."  Id.

at 204.  Our opinion expressed no doubt that the reprimand was a

restraint on speech, despite an eloquent dissent from Judge

Garwood emphasizing that the Commission inflicted no injury or

deprivation on Scott:

> I would not reach the question of whether Scott's First
> Amendment rights would have been violated had the Commission
> taken some action which materially and adversely altered
> Scott's conditions of employment or which placed Scott,
> individually or in his former position as justice of the
> peace, under some legal disability, or caused him in either
> capacity to lose legal rights he would otherwise have had,
> or to be legally subject to some sort of adverse consequence
> of which he would otherwise have been legally free.

Id. at 215 (Garwood, J., dissenting).  Like Scott, Colson is an

---

[6]  Colson does claim that the defendants' conduct caused her to lose her bid for reelection, but she admittedly has no proof of this assertion.

elected public official, and her allegations are similar to his in that both claim to have been the target of public criticism in retaliation for their First Amendment activity.  But, unlike Scott, Colson did not receive a <u>formal</u> reprimand.[7]

On the contrary, Colson has alleged only that she was the victim of criticism, an investigation (or an attempt to start one), and false accusations:  all harms that, while they may chill speech, are not actionable under our First Amendment retaliation jurisprudence.  She maintains that "[i]n retaliation for Colson's expressive activity, from December 1992 through May 1994 and beyond, Defendants conspired together to falsely brand Colson and two of her fellow Council members, Deloss A. Miller and Benny Frank as criminals."  As part of this scheme, Colson claims, Hogg distributed "Pearland Pandemonium" even though "he knew or should have known that the allegations contained in his report were false and would stigmatize Colson, Frank, and Miller and cast them in a false light in the Pearland community."  The

---

[7]    Our court has never explicitly explained why formal reprimands given in retaliation for the exercise of First Amendment rights are actionable but less formal criticisms and accusations are not.  <u>Scott</u> provides additional insight into this distinction. It observed that the Texas Commission on Judicial Conduct, in reprimanding Scott, "<u>investigated</u> the complaints lodged against [him], <u>declared</u> him in violation of the then-existing Code of Judicial Conduct, and <u>enforced</u> its determination by issuing a public reprimand." <u>Scott</u>, 910 F.2d at 208 (emphasis added).  Thus, a formal reprimand, by its very nature, goes several steps beyond a criticism or accusation and even beyond a mere investigation; it is punitive in a way that mere criticisms, accusations, and investigations are not.

defendants' actions in this respect constitute no more than the making of false accusations, which is not actionable under § 1983. Colson also asserts that "Hogg and Grohman, relying on information they knew to be false or with reckless disregard to the truthfulness of the same, repeatedly urged the Brazoria County Attorney's office to indict Colson, Frank and Miller and/or publicly brand them as criminals." These actions are again no more than false accusations and, even insofar as the County Attorney's Office did investigate them, are not actionable under § 1983. Finally, Colson claims that the defendants circulated two sets of recall petitions, even though "they knew or should have known that the allegations contained in the Petitions were false and would stigmatize Colson, Frank, and Miller and cast them in a false light in the Pearland community." The allegations contained in the recall petitions are, like those made to the County Attorney's Office and to the general public, mere accusations that are not actionable under § 1983.

Colson contends, however, that defendants' alleged retaliatory misuse of the recall process is actionable under Smith v. Winter, 782 F.2d 508 (5th Cir. 1986). In Smith, three elected members of a county board of education brought suit in response to an attempt to recall them initiated by the county superintendent of education. See id. at 509. According to the board members, the superintendent became upset after they exercised their First Amendment rights regarding school district

33

matters and refused to vote in accordance with his wishes and, in retaliation therefor, conspired to have them removed from office by

> unlawfully placing certain persons' names on the removal petitions, by unlawfully allowing certain persons to sign the removal petitions who were not qualified to sign them, by unlawfully allowing certain persons to sign the petitions twice, by unlawfully allowing certain persons to print their names on the petitions, by misrepresenting the nature of the petitions to certain persons who signed them on the strength of the misrepresentations, and by falsely certifying and verifying [that the petitions met legal standards].

Id. at 511 n.5. On appeal from the district court's grant of a motion to dismiss for failure to state a claim, this court determined "that this complaint includes allegations that the local appellees conspired through fraudulent means to misuse the recall statute against appellants in retaliation for appellants' exercise of their First Amendment rights. Such a complaint states a claim under § 1983." Id. at 512.

In this case, Colson alleges that the defendants misused the recall process by circulating recall petitions containing false information. Her claim is missing a crucial element, however: She was never subjected to a recall election. In Smith, in contrast, a recall election was held, although the plaintiffs prevailed at the polls and remained school board members at the time we decided the appeal. See id. at 510. Colson argues that the occurrence or non-occurrence of a recall election should make no difference to the success or failure of her claim; according to her, the Smith court acknowledged that it was the misuse of

34

the recall process, not the misuse of the recall process and the resulting recall election, that caused injury.  Insofar as Smith suggested anything of the sort--and we find no clear evidence that it did--such a conclusion would be mere dicta, as a recall election did occur in that case.  Such a suggestion would also be inconsistent with our recent caselaw unequivocally holding that retaliatory criticisms, investigations, and false accusations that do not lead to some more tangible adverse action are not actionable under § 1983.[8]

Finally, we must consider the argument that even if each individual criticism, investigation, and accusation Colson suffered is not actionable, the campaign of retaliatory

---

[8]  Indeed, in Johnson v. Louisiana Department of Agriculture, 18 F.3d 318 (5th Cir. 1994), we held that retaliatory criminal prosecution is not actionable under § 1983 unless it satisfies all the elements of the common law tort of malicious prosecution.  The plaintiff in Johnson alleged that the Department of Agriculture brought charges against him resulting in various penalties, including the revocation of his cropdusting license, four times because he failed to support the agricultural commissioner's reelection campaign.  See id. at 319-20.  We said that "[i]f this allegation asserts a claim on any basis, we agree with the district court that the claim is one for malicious prosecution in violation of Johnson's First Amendment rights" and that "at the very least, if the First Amendment protects against malicious prosecution, Johnson must not only allege a deprivation of a constitutional right, but must also establish all of the elements of the common law tort action." Id. at 320.  Johnson seems to suggest that in order to obtain relief on her retaliatory misuse of the recall process claim, Colson must prove all the elements of an analogous tort, such as abuse of civil process.  The defendants argue that she cannot establish at least two such elements: that a civil proceeding was instituted against her and that she suffered special damages.  Johnson is consistent with our general rule that the plaintiff must cross a certain threshold of harm before she can bring a claim for First Amendment retaliation.

harassment as a whole is.  The plaintiff in <u>Bart</u>, which we cited as support for our conclusion in <u>Smith</u>, 782 F.2d at 512, alleged that her employers had subjected her to a campaign of petty harassments in retaliation for her exercise of her First Amendment rights.  <u>See</u> <u>Bart</u>, 677 F.2d at 624.[9]  On appeal, the Seventh Circuit reversed the district court's dismissal of the complaint for failure to state a claim, noting that the complaint alleged "an entire campaign of harassment which though trivial in detail may have been substantial in gross."  <u>Id.</u> at 625.  Our own cases on this subject have taken place in the employment context, where we have required that the campaign of retaliatory harassment rise to such a level as to constitute a constructive adverse employment action.  For example, in <u>Sharp</u>, we upheld a jury verdict that the plaintiff had been constructively demoted in retaliation for exercising her First Amendment rights because the defendants created an "intolerable situation" causing her to transfer to a less desirable position.  164 F.3d at 934.  In <u>Benningfield</u>, we concluded that a plaintiff alleging a retaliatory "campaign of harassment and retaliation," 157 F.3d at 374, was not constructively discharged because she did not show

---

[9]  The allegedly retaliatory campaign included such things as "baseless reprimands" and "[h]olding [the plaintiff] up to ridicule for bringing a birthday cake to the office on the occasion of the birthday of another employee although the practice was common and was especially favored in the case of supervisory personnel." <u>Bart</u>, 677 F.2d at 624.  It is not clear whether the "baseless reprimands" were the sort of formal reprimands that this circuit has found to be actionable.

36

that a reasonable person in her shoes would have felt compelled to resign, see id. at 376-78. The alleged campaign of retaliation taken against Colson simply did not rise to this level. Even viewing the summary judgment evidence in the light most favorable to Colson, the defendants' allegedly retaliatory crusade amounted to no more than the sort of steady stream of false accusations and vehement criticism that any politician must expect to endure. Cf. Dorsett v. Board of Trustees for State Colleges & Univs., 940 F.2d 121, 123 (5th Cir. 1991) (concluding that the pattern of retaliatory harassment, including decisions concerning teaching assignments, pay increases, administrative matters, and departmental procedures, alleged by a university professor did not "rise to the level of a constitutional deprivation" because "[i]n public schools and universities across this nation, interfaculty disputes arise daily" over such "relatively trivial matters"). In any case, the attacks on Colson seem to have had no effect other than to make her "become more careful on which items [she] would vote on," and they did not stop her from running for reelection. We therefore find that Colson has not alleged any First Amendment deprivation actionable under § 1983. As her Fourteenth Amendment due process claim rests on a theory that she suffered harm to her reputation coupled with the denial of her constitutional right to speak without retaliation, see Paul v. Davis, 424 U.S. 693, 711 (1976), our determination that the defendants did not infringe her First

37

Amendment freedoms requires a conclusion that they also did no injury to her Fourteenth Amendment rights.[10]

### IV. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[10] In Paul, the chiefs of police of two neighboring Kentucky communities distributed a flyer containing the names and photographs of individuals labeled "active shoplifters." 424 U.S. at 694-95. The plaintiff, Edward Charles Davis III, appeared in the center of the second page. Although Davis had been arrested for shoplifting about a year and a half before the flyer appeared, he had pled not guilty, and the charge had been "filed away with leave (to reinstate)," a disposition that left it outstanding. Id. at 695-96. Thus, at the time the flyer was circulated, Davis had been charged with shoplifting, but his guilt or innocence had never been adjudicated, and shortly afterward a judge dismissed the charge altogether. Davis brought an action under 42 U.S.C. § 1983, claiming that the flyer, and in particular the label "active shoplifters," deprived him of a Fourteenth Amendment liberty interest without due process of law. Id. at 696-97. The Supreme Court rejected this argument, holding that reputation alone, apart from injury to a previously recognized right or status, is not liberty or property protected by the Due Process Clause. See id. at 711. As we recounted above, Colson argues that she has made out an actionable Fourteenth Amendment liberty interest claim because she had alleged that the defendants injured her reputation and deprived her of "her First Amendment right to speak out on matters of public concern while she was a Council member, free from retaliation by defendants."

38