**Billy J. BROWN, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner, Social Security Admin., Defendant.**

No. CIV.A. H–02–4036.

United States District Court,
S.D. Texas,
Houston Division.

June 12, 2003.

Victor N Makris, Attorney at Law, Bellaire, TX, for plaintiff.

Cheryl Latrice Chapman, Office of the General Counsel, Social Security Admin., Dallas, TX, for defendant.

## MEMORANDUM AND ORDER

ATLAS, District Judge.

This Social Security Act appeal was referred to Magistrate Judge Calvin Botley pursuant to 28 U.S.C. §§ 636(b)(1)(B). On May 16, 2003, Magistrate Judge Calvin Botley issued a Memorandum and Recommendation [Doc. # 17], suggesting that this Court grant Plaintiff's Motion for Summary Judgment [Doc. # 11], and deny Defendant's Cross Motion for Summary Judgment [Doc. # 14]. The time for objections to the Memorandum and Recommendation has expired without any objections having been filed. The Court finds that the Magistrate Judge's Memorandum and Recommendation is well founded, and that the Magistrate Judge's recommended dispositions should be adopted.[1] It is therefore

**ORDERED** that the **Memorandum and Recommendation** [Doc. # 17] is **adopted** as this Court's Memorandum and Order. It is further

**ORDERED** that the Commissioner's decision is **REVERSED** and that this case is REMANDED to the Commissioner pursuant to "sentence four" of section 405(g) for rehearing (1) to obtain an analysis of Brown's mental residual functional capacity from a competent psychiatrist who has reviewed all of Brown's medical records contained in the record including, but not limited to, the Bayshore Hospital records; (2) to evaluate Brown's disability and RFC in light of medication side-effects; and (3) to obtain a competent and credible evalua-

---

1. Since there are no objections, the Court has not made a *de novo* review of this matter.

tion of the availability and existence of jobs in the national and local economy that Brown can perform in light of all his limitations, physical *and* mental, should this issue continue to remain relevant following the additional disability evaluation that the ALJ is to conduct. It is further

**ORDERED** that Plaintiff's Motion for Summary Judgment [Doc. # 11] is **GRANTED.** It is further

**ORDERED** that Defendant's Cross Motion for Summary Judgment [Doc. # 14] is **DENIED.**

The Court will issue a separate Final Judgment.

## MEMORANDUM AND RECOMMENDATIONS

BOTLEY, United States Magistrate Judge.

Plaintiff Billy J. Brown ("Brown"), seeks judicial review of the Social Security Administration's ("SSA") denial of his claim for social security disability benefits provided by Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.* *See* Plaintiff's Motion for Summary Judgment (Entry # 11), Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment (Entry # 12) and Plaintiff's Response to Defendant's Motion for Summary Judgment (Entry # 16).[1] Defendant Jo Anne B. Barnhart, Commissioner of Social Security ("Commissioner"), urges her decision denying Brown's claim for benefits be upheld and maintains that Brown was not disabled as he was capable of performing certain limited light work, and that such work exists in significant numbers in the national economy. *See* Defendant's Cross Motion for Summary Judgment (Entry # 14), Brief in Support of Defendant's Cross Motion for Summary Judgment (Entry # 15).[2] Brown alleges numerous grounds of error. Brown contends that the Administrative Law Judge ("ALJ") erred by failing to consult a medical expert regarding his residual functional capacity ("RFC"). Brown further contends that a RFC finding should be made with respect not only to his physical impairments, but also his mental impairments. Additionally, Brown contends that the ALJ erred by formulating his own medical opinion of his mental impairment without the assistance of a medical expert; improperly relied upon the testimony of the vocational expert ("VE") in response to a hypothetical question which failed to incorporate all of his severe impairments; failed to consider the impact of side effects from multiple medications on his ability to work; failed to state why he rejected evidence favorable to him, evincing two additional severe impairments; failed to conduct a meaningful evaluation of the credibility of Brown and his witnesses; failed to determine whether he could maintain employment; and improperly found that he did not meet or equal Listing 12.04. Brown further contends that new evidence, received after the hearing, would have materially changed the outcome of the hearing had it been presented to the ALJ.

Conversely, the Commissioner contends that her finding that Brown was not dis-

---

1. Plaintiff's Motion for Summary Judgment (Entry # 11), Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment (Entry # 12) and Plaintiff's Response to Defendant's Motion for Summary Judgment (Entry # 16) will be referred to henceforth as the single instrument, "Plaintiff's Motion for Summary Judgment (Entry # 11)."

2. Defendant's Cross Motion for Summary Judgment (Entry # 14) and Brief in Support of Defendant's Cross Motion for Summary Judgment (Entry # 15) will be referred to henceforth as "Defendant's Motion for Summary Judgment (Entry # 14)."

abled because he retains the residual functional capacity to perform other work existing in significant numbers in the national economy is premised upon substantial evidence and the proper application of the relevant legal standards. The Commissioner further contends that new medical evidence submitted to the Appeals Council does not warrant remand, as the ALJ properly found that Brown's alleged impairments did not meet or equal the requirements of Listing 12.04, and that the ALJ did not err in finding that Brown experienced no medication side effects, or in not specifically acknowledging Brown's alleged fibromyalgia or tinnitus.

## THE FACTUAL AND PROCEDURAL BACKGROUND

### The Medical History and Alleged Impairments

Brown was 41 years old at the time of his hearing. He has a ninth grade education and past relevant work experience as a heavy equipment operator and landscaper. (Tr. 19).[3] In 1970, Brown fractured his left leg in eight places. In 1984, he broke his left leg again when a pipe was dropped on him, and also suffered back problems as a result. In 1994, Brown fractured his left wrist and left clavicle in a fall. (R. 209). He was diagnosed with a seizure disorder in 1994 and had been taking a daily dosage of 600 mg of Dilantin, an anti-seizure medication, until approximately the middle of 1999, when the dosage was reduced to 300 mg.[4] (R. 209). Brown lost his drivers' license as a result of the seizures, which reportedly led to depression and suicide attempts. (Tr. 46). He was hospitalized in a psychiatric facility in approximately 1989. (R. 196). No records appear in the file related to his psychiatric hospitalization. Records do reveal, however, that Brown was treated by the Harris County Hospital District in Houston, Texas ("HCHD") on July 5, 1992, for a stab wound to the chest from an icepick (R. 136). Brown claims that he has suffered from tinnitus since approximately 1979,[5] and that he has had a fungal infection in his chest since approximately 1998, for which he was taking antifungal medication.[6] (R. 209).

HCHD records, dated April 6, 1999, indicate that Brown was having suicidal thoughts, uncontrollable crying and was feeling resentment, rage, and depression. He was diagnosed at that time with depression and pneumonitis. (R. 160). Psychiatry Clinic records, dated May 6, 1999, from Ben Taub Hospital ("Ben Taub") in Houston, Texas indicate that Brown "has frequent episodes of anxiety, anger, [and] temper tantrums where he becomes uncontrollable" and that he has had frequent periods of major depression since 1995,

---

**3.** References made to statements taken from that portion of the administrative record identified as the "transcript" of the administrative hearing are designed "T," followed by the applicable page number(s) of the record; and, references made to items contained in the remainder of the record are designed "R," followed by the applicable page number(s).

**4.** In addition to Dilantin, the record indicates that Brown takes numerous medications daily, including Buspar, HCT2, Hydroxyzine, Promethazine, Clonazepam (Klonopin), Zoloft, Prevacid, Ranitidine and Albuterol. (R. 120). The record also indicates that Brown has taken Darvocet and Valium. (R. 129). A Harris County Hospital District Outpatient Medication Profile shows that Brown was prescribed ten different medications in the month of February, 1999, alone (R. 157).

**5.** Records from the Harris County Hospital District, dated March 30, 1999, indicate that Brown was diagnosed with tinnitis. It is not evident from the records, however, how long Brown suffered from this condition. (R. 162).

**6.** Pathology records, dated March 5, 1999, indicate that a sputum culture was positive for candida albicans. (R. 173).

when he sustained a major injury at work. (R. 146). Brown also complained of dizziness when standing up and was diagnosed at that time with major depression. (R. 147). An Outpatient Problem Summary sheet, dated May 6, 1999, indicates, among other things, that Brown was suffering from depressive disorder, panic disorder and acute stress. (R. 148).

Ben Taub Psychiatry Clinic records, dated June 23, 1999, indicate that Brown was "angry and intense" and admitted to five (5) prior suicide attempts in the past two years, including attempted overdosing and stabbing himself. He was diagnosed with major depressive disorder and dysthymia and given an Axis V diagnosis on the Global Assessment of Functioning ("GAF") Scale of 50.[7] He was prescribed Zoloft, Klonopin and Buspar. (R. 131). Harris County Hospital District records, dated June 25, 1999, indicate that Brown was diagnosed with fibromyalgia. (R. 145).

Brown underwent a consultative examination with George T. Conklin, M.D. on August 25, 1999. (R. 195–198). It does not appear from Dr. Conklin's report that Dr. Conklin reviewed Brown's medical records. However, Dr. Conklin gave the following history:

[Brown] was in an accident in 1978 and suffered multiple fractures involving the right and left leg and left wrist. In 1981, he thinks the pin was removed from the right leg. He has been hospitalized for seizures at least three times. He had a sinus tumor which might have been a polyp removed at one time. He admits to having had a nervous breakdown. He states he has had trouble controlling his emotion [sic] and he cries. At times he feels like killing himself and he has tried twice, although not recently. Once he tried it by stabbing himself and once by overdosing. He is seeing a psychiatrist. He was hospitalized for psychiatric care about ten years ago. (R. 196).

Dr. Conklin obtained an x-ray of Brown's lumbar spine and pulmonary function studies, including diffusion capacity. (R. 197). According to Dr. Conklin, Brown's primary problem is low back pain. Brown also has chest pain, but both the back and chest pain are of an unclear etiology. Brown also reported that he has a fungal pneumonia which is under treatment. Dr. Conklin also specified that Brown "has a marked fatigue and it is unclear whether this is a medical condition or a psychological [sic]." (R. 197). According to Dr. Conklin, Brown "has a grand mal seizure disorder which has not been adequately controlled except perhaps in the last month." (R. 198).[8] Dr. Conklin

---

7. The GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 30 (4th ed.1994). The GAF Score is taken from the GAF Scale, which "is to be rated with respect only to psychological, social and occupational functioning." Id. The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death.) Id. at 32. A GAF Score in the range of 41 to 50 represents "[s]erious symptoms" (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). Id.

8. Brown told Dr. Conklin that he has had a seizure disorder for approximately three years prior to the examination. He does not have any warning of the seizures coming on but he generally awakens in an ambulance. He bites his tongue and sustains bumps on his head, and he is told that he thrashes around during the seizures. He had three seizures the month before the examination, but has had none so far in the month of the examination, perhaps, according to Dr. Conklin, "from an adjustment of his medication." (R. 195).

also determined that Brown "appears limited by his back pain which likely would prevent him from activities which would require lifting." (R. 198). Dr. Conklin also noted that Brown had an "unkempt" appearance. (R. 198).

In an undated Field Office Disability Report, agency interviewer A. Jackson–Allen described Brown as an "unkempt, dirty man with a very poor memory." (R. 112). Mr. Allen stated that Brown had difficulty with understanding, concentrating, and answering. (R. 112).

Brown underwent a consultative psychiatric evaluation with Dr. Richard E. Palmer on September 20, 1999. It does not appear from Dr. Palmer's Consultative Psychiatric Evaluation report (R. 208–211) that Dr. Palmer reviewed Brown's medical and/or psychiatric records. During the examination, Brown reported to Dr. Palmer that he doused himself with gasoline the previous week and set himself on fire following an argument with his wife. Brown further reported that he went to the hospital for burn treatment, but, out of fear of being hospitalized, told the hospital personnel that he was burned while attempting to repair a car.[9] Brown sustained *deep second degree burns on his neck.* (R. 234). Brown also told Dr. Palmer that six years earlier, he pulled a knife on some police officers in the hope that a policeman would shoot him. Brown stated that he wanted to die, but does not believe in killing himself because he does not "want to go to hell." (R. 208). Brown also took an overdose of drugs when he was twenty years old. (R. 208). Dr. Palmer stated that Brown presently continues to have "rages and crying spells" and that Brown commented, "I just look at some people

and I want to kill them." (R. 208). Dr. Palmer diagnosed Brown as suffering from severe recurrent major depression and gave him a GAF score of 48.[10] Dr. Palmer stated:

> Mr. Brown appears to have many symptoms consistent with depression. He does not seem to have responded very well to antidepressants to date. He has had symptoms of suicidal thoughts and attempts, sleep continuity disorder, low energy, poor concentration, and feeling hopeless and helpless. (R. 211).

With respect to social functioning, Dr. Palmer noted that Brown "prefers to stay alone in a dark room" and "can be around other people if they do not talk to him." (R. 210). In addition, Dr. Palmer noted that Brown's prognosis "[a]ppears to be poor at this time" and that Brown "does not appear to be capable of managing funds" (R. 211) or benefit payments in his own interest. (R. 212).

An agency doctor, Dr. A. Boulos, conducted a psychiatric review with respect to Brown's claim. Dr. Boulos did not examine or treat Brown. In his Psychiatric Review Technique Form ("PRTF"), dated October 8, 1999, Dr. Boulos indicates "insufficient medical evidence (i.e., a programmatic documentation deficiency is present)" "on or before DLI," (R. 216) and his notes state, "[t]he alleged limitations caused by the mental symptoms are not fully supported by the EOR." (R. 217). With respect to Listing 12.04, Affective Disorders, Dr. Boulos found Brown to have a "[d]isturbance of mood, accompanied by a full or partial manic or depressive syndrome," and found there to be "depressive syndrome" characterized by

---

**9.** Brown's sister-in-law testified during the administrative hearing that Brown doused himself with gasoline and set himself on fire in the presence of herself and her thirteen year old son. (T. 51–52).

**10.** This score is consistent with the GAF score of 50 given Brown by the Ben Taub Psychiatry Clinic on June 23, 1999. (R. 131).

the following four symptoms: sleep disturbance; decreased energy; difficulty concentrating or thinking and thoughts of suicide. (R. 219). Dr. Boulos rated the severity of Brown's impairment as: (1) moderate restriction of activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) often having deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in a work setting or elsewhere) and (4) never having episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).[11] (R. 233). Accordingly, Dr. Boulos indicated that Brown had zero functional limitations manifested at the degree of limitation that satisfies the Listing, (R. 223) and found an RFC assessment to be necessary. (R. 216).

Dr. Boulos proceeded to complete a Mental Residual Functional Capacity ("MRFC") evaluation form on October 8, 1999. (R. 214). In his evaluation, Dr. Boulos stated (in nearly illegible handwriting): "[Brown] retains the abilities to understand and carry out simple instructions, to interact with coworkers and supervisors and to adapt to routine changes in work settings." With respect to a list of twenty functions, Dr. Boulos found Brown to be "Not Significantly Limited" with respect to fourteen functions and only "Moderately Limited" with respect to the remaining six functions. For example, under the "Sustained Concentration and Persistence"

heading, Dr. Boulos found that Brown was not significantly limited in "the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms."[12] Dr. Boulos also found, under the heading of "Social Interaction," that Brown was only moderately limited in the "ability to interact appropriately with the general public" and the "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes." Further, Dr. Boulos found that Brown was not significantly limited in the ability "to maintain socially appropriate behavior." The ALJ completed a PRTF on August 22, 2000. The ALJ's PRTF mirrors the one prepared by Dr. Boulos. (R. 28–35).

Dr. Prem Nowlakha, board certified in internal medicine, testified at the hearing as a medical expert. Dr. Nowlakha did not treat or examine Brown. Dr. Nowlakha testified that although Brown suffers from a seizure disorder and has some back problems, the seizure disorder is controlled by Dilantin and the back problems are not disabling. Dr. Nowlakha also testified that with regard to his breathing difficulties, Brown had pneumonia but had good pulmonary function. He concluded, therefore, that Brown was not disabled as he did not meet or equal any listing and maintained the residual functional capacity to perform sedentary work, although limited to not using machinery and avoiding heights. (Tr. 54). Dr. Nowlakha did not testify with regard to Brown's severe depression or any of Brown's alleged mental limitations.

---

**11.** According to the Record, because of his alleged limitations, Brown had not worked for four years prior to his psychiatric consultative examination. It appears that Dr. Boulos' conclusion that Brown is "never" limited by episodes of deterioration or decompensation in a work-like setting is based upon an absence of workplace evidence.

**12.** This is fundamentally inconsistent with Dr. Boulos' PRTF findings that Brown "often [has] deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in a work setting or elsewhere)." (R. 233).

Dr. Karen E. Nielsen, a vocational analyst (hereinafter "VE"), provided the following testimony at the hearing with respect to the types and availability of jobs Brown would be able to perform:

ALJ: Now based on his age, education, as past work experience, assume I'd find that he has to alternate between the sitting and standing at will with no more than 10 pounds, sedentary level. Further restrictions are no heights or climbing, no moving or dangerous equipment, no driving, climate control, low stress, could he do his past relevant work?

A: No.

Q: Do any of his skills transfer?

A: No.

Q: Could you give me three examples of unskilled, please?

A: Yes, at the sedentary level there's a final inspector that would meet that which is sedentary, unskilled. A Laminator I—sedentary, unskilled. A car lot operator—sedentary, unskilled.

Q: Number, please?

A: There's approximately 40,000 Harris County, reports surrounding counties a combination of these type jobs and 400,000 nationwide. And that's taking into consideration the limitations. (Tr.21–22).

Records submitted after the hearing indicate that Brown's primary care physician, Dr. John J. Adams reported that as of October 13, 1999 and November 16, 2000, Brown was permanently disabled having both mental and physical disabling factors and could not work. Dr. Adams indicated that Brown was suffering from asthmatic bronchitis, depression, seizure disorder and severe cough and dyspnea, and had a prognosis of "guarded." (R. 276–277). A Discharge Summary from Bayshore Medical Center ("Bayshore"), dated October 12, 2000, indicates that Brown attempted suicide by taking twenty to thirty Valium tablets following an argument with his son. Reportedly, Brown was angered over his son's predilection to dressing like and listening to the music of shock-rocker Marilyn Manson. The two got into an argument, the argument became physical, and, in the course of attempting to separate the two, Brown's wife bit Brown's right hand and fingers. (R. 278).

The records submitted subsequent to the hearing further indicate that following the attempted overdose, Brown was hospitalized at Bayshore for ten days, during which time he received psychiatric and other diagnostic testing. Upon admission, Brown was given a diagnosis of benzodiazepine overdose and opiate medication, suicidal ideation, manic depression, bipolar disorder, history of suicide attempts in the past and seizure disorder. (R. 278–279). His past medical history is noted as "significant for bipolar disorder," following three attempts of suicide, the last of which was "several months ago when he put himself on fire." (R. 280). He also was noted to have six episodes of seizures a month which has now decreased to two episodes per month. (R. 284). He was also admitted to the hospital less than two months earlier with ulcers and bleeding of the stomach. (R. 284). An MRI of the spine, taken during the hospitalization, showed "early degenerative change and mild bulging of the L3–4 and L4–5 intervertebral discs" and "wedging of the bodies of T11 and T12." (R. 287). X-rays of the hand showed a "fracture deformity of the distal radius, predominantly the radial styloid, without a distinct fracture line" that "may be an old fracture and warrants careful clinical correlation." Also shown was evidence of an old malunited fracture of the distal ulnar styloid. (R. 288). Although the Appeals Council considered the addi-

tional evidence, it concluded that the additional evidence did not provide a basis for changing the Administrative Law Judge's decision. (R. 8–9).

### The Administrative Proceedings and Exhaustion of Administrative Remedies

Brown filed an application for a period of disability and disability insurance benefits under Title II and for Supplemental Security Income under Title XVI on June 4, 1999, alleging a disability beginning on June 16, 1997 due to seizures, respiratory disease, osteomylitis, back pain, right leg pain, poor memory and depression (Tr. 19; 85–87). He was insured for disability benefits through December 31, 1997. (Tr. 19).

Brown filed a Request for Hearing by an Administrative Law Judge on March 8, 2000. (Tr. 71). A hearing was held before the ALJ on May 25, 2000, in Bellaire, Texas. Brown, who was represented by counsel, testified on his own behalf. Dr. Prem Nowlakha testified as a medical expert, Karen E. Nielsen testified as a vocational expert (Tr. 18) and Brown's sister-in-law, Connie Gills, testified as a lay witness. (Tr. 37).

On August 20, 2000, the ALJ issued a decision denying Brown's request for benefits. (Tr. 27). The ALJ found that Brown has severe impairments, but that such impairments do not meet or equal the requirements of any listed impairment. (Tr. 26). The ALJ also found Brown's allegations regarding his impairments and their effect upon his ability to work to be not entirely credible. (Tr. 26). Based on the evidence as a whole, the ALJ found that Brown retained the ability to perform sedentary work which allowed him the option to work while sitting or standing. (Tr. 27). In addition, the ALJ found that Brown's residual functional capacity for sedentary work was limited by his inability to climb ladders, ropes or scaffolds, work at heights or around moving or dangerous machinery, or drive a motorized vehicle. (Tr. 27). Additionally, the ALJ found that Brown must work in a controlled climate and low stress environment. (Tr. 27).

The ALJ determined that Brown's RFC prevented him from performing his past relevant work. (Tr. 27). However, the ALJ also determined that Brown had the ability to perform other work existing in significant numbers in the national economy. (Tr. 27). As such, the ALJ found that Brown was not disabled within the meaning of the Social Security Act at any time through the date of the decision (Tr. 26–27).

The Appeals Council denied the request for review of this decision on August 16, 2002. (Tr. 8–9). Brown has, accordingly, exhausted all administrative remedies prior to seeking judicial review, and, accordingly, the Court has the proper authority, conferred statutorily, with which to commence its review.[13] See *Sims v. Apfel,* 530 U.S. 103, 107, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000); *Weinberger v. Salfi,* 422 U.S. 749, 757, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *Jackson v. Apfel,* 234 F.3d 246 (5th Cir.2000); *McQueen v. Apfel,* 168 F.3d 152, 155 (5th Cir.1999); *see also* 42 U.S.C. § 405(g); 28 U.S.C § 1383(c)(3) and 20 C.F.R. § 404.981 and/or 20 C.F.R. § 416 (1999), *as applicable.*

### STANDARDS OF REVIEW

#### The Motion for Summary Judgment

The standards under which a summary judgment motion is to be considered are well established. Summary judgment is proper if there is no genuine dispute as to

---

13. This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. section 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act and Rule 72, Fed.R.Civ.P. *See* Order of Referral (Entry # 2).

any material fact and the moving party is, therefore, entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), quoting *Fed.R.Civ.P. 56(c);* see also *Colson v. Grohman*, 174 F.3d 498, 506 (5th Cir.1999); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998); *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir.1993). The moving party bears the burden of showing that there is an absence of evidence to support the non-movant's case. *Id.* A factual dispute is "genuine" when a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see also *PYCA Industries, Inc. v. Harrison County Waste Water Management District*, 177 F.3d 351, 361 (5th Cir. 1999); *Crowe v. Henry*, 115 F.3d 294, 296 (5th Cir.1997). The substantive law dictates which facts are "material." See *Stewart v. Murphy*, 174 F.3d 530, 533 (5th Cir.1999), *cert. denied*, 528 U.S. 906, 120 S.Ct. 249, 145 L.Ed.2d 209 (1999); *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir.1991). An issue is material if its resolution could affect the outcome of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505. Facts may be gleaned from reviewing the pleadings, answers to interrogatories, admissions and affidavits on file. See *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994)(*en banc* ). In deciding whether a fact issue has been created, all justifiable inferences must be viewed in the light most favorable to the nonmoving party, and questions of law are reviewed *de novo*. See *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Merritt–Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir.1999); *Horton v. City of Houston*, 179 F.3d 188, 191 (5th Cir.1999). If the summary judgment motion is properly supported, however, the

burden shifts from the movant to the adverse party, who may not rest on mere allegations or denials, but must set forth specific and supported material facts, of significant probative value, establishing that there exists a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *International Association of Machinists and Aerospace Workers v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir.2000); *Union Planters National Leasing, Inc. v. Woods*, 687 F.2d 117, 119 (5th Cir.1982).

### The Administrative Determination

 A review of the Commissioner's decision to deny disability benefits compels a determination of whether substantial evidence in the record supports the decision, and further, whether proper legal standards were used in evaluating the evidence. *Loza v. Apfel*, 219 F.3d 378, 389 (5th Cir.2000); *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir.2000); *Crowley v. Apfel*, 197 F.3d 194, 197 (5th Cir. 1999); *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir.1999). "Substantial evidence" means that which is more than a mere *scintilla*, but less than a preponderance; and, it is evidence of such relevance that a reasonable mind would accept it as adequate to support the conclusion reached. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir.1999); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir.1995)(*per curiam* ). The Court is not, however, allowed to reweigh the evidence, retry the facts *de novo*, or substitute its judgment for that of the Commissioner. *Id.*; see also *Watson v. Barnhart*, 288 F.3d 212 (5th Cir.2002); and, any finding that there is no substantial evidence to support the Commissioner's determination is appropriate only if no

credible evidentiary choices or medical findings exist to support the decision, *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Kinash v. Callahan*, 129 F.3d at 738; *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir.1995), thereby, compelling a "[j]udicial review [that is] deferential without being so obsequious as to be meaningless." *Brown v. Apfel*, 192 F.3d at 496; *Taylor v. Bowen*, 782 F.2d 1294, 1298 (5th Cir.1986).

### Determining the Existence of an Eligible Disability

"Disability" is a legal status that is determined by the ALJ after evaluating expert medical and vocational findings; however, the ALJ's determination must conform to the legal standards established and be supported by substantial evidence. See *Richardson v. Perales*, 402 U.S. at 401, 91 S.Ct. 1420; *Loza v. Apfel*, 219 F.3d at 389. The inquiry necessarily becomes whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached by the ALJ. *Id.* It remains, however, the claimant's burden to establish the disability. See *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir.1992); see also *42 U.S.C. §§ 416, 423.*

To determine the existence of an eligible disability there must, initially, be an evaluation of whether the claimant was unable to perform substantial gainful work existing in the national economy because of a medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted, or which can be expected to last, for a continuous period of not less than twelve (12) consecutive months. 42 U.S.C. §§ 416(1), 423(d)(1)(a), 1614(a)(3)(A); *Barnhart v. Walton*, 535 U.S. 212, 223–24, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002); *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 119 S.Ct. 1597, 1599, 143 L.Ed.2d 966 (1999); *McQueen v. Apfel*, 168 F.3d at 154; *Greenspan v. Shalala*, 38 F.3d 232,

236 (5th Cir.1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995).

A five-step sequential process is utilized by the ALJ to determine whether a claimant qualifies for disability benefits. See *20 C.F.R. § 404.1520(b)-(f)(1998)*; *Loza v. Apfel*, 219 F.3d at 390; *Leggett v. Chater*, 67 F.3d at 563. The claimant has the burden of establishing the first four steps of the five-step sequential process by establishing a severe impairment which prevents the claimant from performing past relevant work. In this five-step process, the ALJ must consider:

1) whether the claimant is currently engaged in substantial gainful activity, as an individual who is working and engaging in substantial gainful activity will not be found disabled, regardless of the medical findings;

2) whether the claimant has a severe impairment;

3) whether the claimant meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, as such an individual will be considered disabled without consideration of vocational factors;

4) if an individual is capable of performing the work they did in the past, a finding of not disabled must be made; and,

5) if an individual's impairment precludes them from performing their past work, other factors, including age, education, past work experience and residual functional capacity must be considered to determine if there is any work in the national economy that the individual can perform.

*20 C.F.R. § 404.1520(b)-(f)*; see also, *Carey v. Apfel*, 230 F.3d 131, 134–5 (5th Cir. 2000); *Brown v. Apfel*, 192 F.3d at 498; *Leggett v. Chater*, 67 F.3d at 566.

The Commissioner bears the burden as to the fifth step of the process. See *Myers v. Apfel,* 238 F.3d 617, 619 (5th Cir.2001). If the Commissioner meets this burden, the claimant must then prove that he or she cannot, in fact, perform the alternate work suggested. See *Waters v. Barnhart,* 276 F.3d 716, 718 (5th Cir.2002); *Carey v. Apfel,* 230 F.3d at 135. If, at any step of the analysis the ALJ finds that the claimant is or is not disabled, the inquiry is terminated. *Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *Myers v. Apfel,* 238 F.3d at 619.

## DISCUSSION

### I. The ALJ'S Determination of Mental Residual Functional Capacity is Not Supported by Substantial Evidence

█ Brown appeals the Commissioner's finding that the claimant was not disabled on several grounds. Brown's first point of contention is that the ALJ erred by failing to consult with a medical expert regarding his mental residual functional capacity. An RFC assessment determines what type of work activities a claimant can still perform despite his or her severe impairments, and is based on all relevant evidence, including the claimant's own statements, observations by treating, examining and consulting physicians or psychologists, family members, neighbors, friends, and others in addition to those making observations as part of formal medical examinations. These observations must be considered along with medical records. 20 C.F.R. § 404.1545(a). The responsibility for assessing and determining RFC lies with the ALJ, and the assessment is based on all of the evidence the SSA has, including statements regarding the claimant's abilities, provided by treating, examining, or consulting physicians, or any other medical or psychological consultants designated by the Secretary of the SSA. 20 C.F.R. § 404.1546. The First Circuit has held that the ALJ, as a lay fact finder, lacks sufficient expertise to conclude that a claimant has the abilities to perform certain tasks, and an explanation of the claimant's residual functional capacity from a physician is needed. *Rivera–Torres v. Secretary of Health and Human Services,* 837 F.2d 4, 7 (1st Cir.1988).

20 C.F.R. § 404.1520(a) sets forth the technique to be followed in the evaluation of mental impairments. Under the procedure in effect at the time of the hearing before the ALJ,[14] the examiner of the mental disability claim (in this case, the ALJ) must first "record the pertinent signs, symptoms, findings, functional limitations and effects of treatment contained in [the] case record," in order to determine if a mental impairment exists. 20 C.F.R. § 404.1520a(b)(1). If an impairment is found, the ALJ must determine whether certain medical findings relevant to a claimant's ability to work are present or absent. 20 C.F.R. § 404.1520a(b)(2). The ALJ must then evaluate the degree of functional loss resulting from the impairment in four separate areas deemed essential for work. 20 C.F.R. § 404.1520a(b)(3). If the degree of functional loss falls below a specified level in each of the four areas, the ALJ must find the impairment "not severe," which generally concludes the analysis and terminates the proceedings. 20 C.F.R. § 404.1520a(c)(1). If the mental impairment is "severe" under 20 C.F.R.

14. Since Brown's administrative hearing, 20 C.F.R. § 404.1520a has been revised and amended. The revisions and amendments became effective on September 20, 2000. 65 Fed.Reg. 50,746 (August 21, 2000). The cita- tions in this paragraph are to the regulations as they existed in May of 2000, when Brown's case was being heard and considered by the ALJ and the Commissioner.

§ 404.1520a(c)(1), the ALJ must then determine if it meets or equals a listed mental disorder under 20 C.F.R. pt. 404, subpt. P., app. 1, 12.00–12.09. 20 C.F.R. § 404.1520a(c)(2). If the impairment is severe, but does not reach the level of a listed disorder, then the ALJ must conduct a residual functional capacity assessment. 20 C.F.R. § 404.1520a(c)(3). The ALJ must also append a "standard document outlining the steps of [the § 404.1520a procedure] to the decision." 20 C.F.R. § 404.1520a(d). *Boyd v. Apfel,* 239 F.3d 698, 705 (5th Cir.2001).

In the present case, the ALJ did complete a PRTF. (Tr. 28–35). Moreover, in his decision, the ALJ incorporated his findings and conclusions based on the application of the technique, set forth Brown's significant history, including his significant psychological history, and the functional limitations that were considered in reaching his conclusion as well as the degree of limitation. (Tr. 22–26). The ALJ's evaluation of the evidence specifically discusses Brown's history of depression and psychiatric hospitalization approximately ten years earlier. The ALJ also discusses the report of the examining psychiatrist, Dr. Palmer, concerning the psychiatric consultation Dr. Palmer conducted with respect to Brown, but the ALJ does not discuss the fact that with respect to the Axis V diagnosis of Brown's ability to function based on psychological limitations, Dr. Brown and the Ben Taub Psychiatry Clinic gave Brown GAF scores of 48, and 50, respectively, (indicating "serious" symptoms or "serious impairment" in "social, occupational, or school functioning"). Further, the ALJ does not reconcile Dr. Palmer's Axis V diagnosis with the assessment of the non-examining agency doctors who found Brown to be, at most, "moderately" functionally limited. (R. 213–214). The ALJ specifies that he "agrees with the state agency physicians' analysis" (R. 24), stating that the medical evidence does not show a condition which prevents all performance of work activities, but the ALJ does not discuss the inherent discrepancies between the evaluations of Brown's functional capabilities made by the non-treating, non-examining agency doctors and those of examining psychiatrists, Dr. Palmer and the psychiatrist at The Ben Taub Psychiatry Clinic.

The ALJ's decision also includes a discussion of Dr. Nowlakha's testimony at the hearing, including testimony that Brown retained the ability to perform work-related activity at the sedentary level of physical exertion, limited by the need to not use machinery and height limitations due to the seizures. (Tr. 53–54) Dr. Nowlakha's testimony, however, was limited solely to Brown's physical impairments. In evaluating his residual functional capacity, the ALJ found that Brown has a combination of impairments that evaluating them in combination effectively reduces his work base to a sedentary level. (Tr. 24).

The ALJ followed the necessary steps in completing the mental residual functional capacity evaluation as required by the statute. However, substantial evidence does not exist to support the ALJ's findings. "Disability" is a legal status that is determined by the ALJ after evaluating expert medical and vocational findings; however, the ALJ's determination must be supported by substantial evidence. See *Richardson v. Perales,* 402 U.S. at 401, 91 S.Ct. 1420; *Loza v. Apfel,* 219 F.3d at 389. The inquiry necessarily becomes whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached by the ALJ.

The only evidence in the record that would support the ALJ's conclusions with respect to mental residual functional capacity is the PRTF prepared by the non-treating, non-examining agency psychia-

trist, on October 8, 1999. (R. 225). As discussed above, the agency doctor's analysis is inherently inconsistent and his report conflicts in a significant way with the opinion of the psychiatrist performing the consultative examination, Dr. Palmer, and that of a treating psychiatrist at Ben Taub. The agency psychiatrist and ALJ disregarded, without explanation, the consultative examiner's and Ben Taub psychiatrist's findings and opinions in arriving at the conclusion that Brown was, at the very most, "moderately" impaired in certain functional aspects. Thus, because the only evidence to support the ALJ's findings is the flawed evaluation by the agency psychiatrist, there is insufficient evidence to support the ALJ's findings with respect to Brown's residual functional capacity. *See, Rivera–Torres,* 837 F.2d at 7. Therefore, upon remand, the Court should order the ALJ obtain an analysis of Brown's mental residual functional capacity by a competent psychiatrist and that the psychiatrist be allowed to review all of Brown's medical records, to assist in reaching a conclusion as to the claimant's mental condition.

## II. The ALJ Erred By Relying on a Response to a Defective Hypothetical Question Posed to the Vocational Expert Regarding Other Work that Brown Could Perform

■ At the fifth step of the ALJ's analysis, the ALJ found that Brown did retain the residual functional capacity to perform certain limited sedentary work available in significant numbers in the national economy and, accordingly, was not "disabled" for purposes of qualifying for social security disability benefits. The Commissioner bears the burden at the fifth step of the process. See *Myers v. Apfel,* 238 F.3d 617, 619 (5th Cir.2001).

■ In order to meet the Commissioner's burden of proof, the ALJ attempted to elicit evidence regarding the availability of appropriately limited sedentary jobs through the testimony of the VE. However, the ALJ's hypothetical question to the VE did not incorporate any of Brown's mental limitations. A hypothetical question to a VE is deemed defective and in error unless (1) the assumptions reasonably incorporate all of the disabilities recognized by the ALJ, and (2) the claimant is afforded the opportunity to correct deficiencies in the ALJ's question. *Boyd,* 239 F.3d at 707; *Bowling v. Shalala,* 36 F.3d 431, 437 (5th Cir.1994).

■ Part one of the test is not met here because the ALJ's hypothetical question did not include all of Brown's disabilities as recognized by the ALJ. The ALJ recognized that Brown had a severe impairment in the category of 12.04 Affective Disorders. (R. 28). The ALJ recognized, among other things, that Brown had "moderate" restrictions of activities of daily living, "moderate" difficulties in maintaining social functioning, and that Brown "often" had deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner in work settings or elsewhere. (R. 34). None of these limitations were incorporated into the ALJ's hypothetical, and there is no testimony by the VE that sedentary jobs allowing for these deficiencies exist in sufficient numbers in the national economy. As the first prong of the test is not statutorily satisfied; therefore, the second prong need not be addressed. See *Boyd,* 239 F.3d at 707 (the holding in *Bowling* did not state that a party's failure to point out the problems in a defective hypothetical automatically salvages that hypothetical as a proper basis for a determination of non-disability). Only where the testimony by the VE is based on a correct account of a claimant's qualifications and restrictions, an ALJ may properly rely on the VE's testimony and conclusion. *Leggett v. Chater,* 67 F.3d 558, 565 (5th Cir.1995). Un-

less there is record evidence to adequately support the assumptions made by a VE, the opinion expressed by the VE is meaningless. *Bowling*, 36 F.3d at 436.

■ The ALJ has a duty to develop the facts fully and fairly relating to an applicant's claim for disability benefits. If the ALJ does not satisfy his duty, his decision is not substantially justified. *Boyd*, 239 F.3d at 708 (citing *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir.2000) and *Ripley*, 67 F.3d at 557). Where the ALJ relied on testimony elicited by a defective hypothetical question, the ALJ did not carry his burden of showing that despite the claimant's impairments, the claimant could have performed available work. In the absence, as here, of clear testimony from the VE, or other credible evidence in the record that jobs existed in sufficient numbers in the national economy to accommodate all of Brown's limitations,[15] substantial evidence to support the ALJ's finding of no disability is lacking, and the Commissioner has failed to meet her burden of proof on this issue. On remand, the ALJ should obtain a competent and credible evaluation of the availability and existence of jobs in the national and local economy that Brown could perform in light of all his limitations, physical and mental, should this issue continue to remain relevant following the additional disability evaluation that the ALJ is to conduct on remand as discussed above.

### III. The New Evidence Should be Considered

■ When new evidence becomes available after the Commissioner of Social Security's decision and there is a reasonable probability that the new evidence would change the outcome of the decision, a remand is appropriate so that this new evidence can be considered. *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir.1995). To justify a remand, the Act requires that the evidence is "new" and "material" as well as a showing of "good cause" for failing to provide this evidence at the original proceedings. *Id.* The Court reviews new evidence only to determine if a remand is appropriate. *Id.* Reviewing the materiality of new evidence requires two separate inquiries: (1) whether the evidence relates to the time period for which the disability benefits were denied, and (2) whether there is a reasonable probability that this new evidence would change the outcome of the Commissioner's decision. *Id.* The new evidence in this case from Bayshore Medical Center (R. 278–289) meets both criteria.

The Bayshore records should be considered in a determination of Brown's disability as Brown has made the required showing with respect to the post-hearing suicide attempt and subsequent hospitalization. The evidence of Brown's post-hearing suicide attempt relates to the period for which disability benefits are sought. The suicide attempt, and the results of the psychiatric evaluations Brown underwent during his ten-day hospitalization which followed, are further evidence of the nature and severity of Brown's severe depression, which predated the hearing and resulted in several documented pre-hearing suicide attempts. In addition, this evidence is relevant to Brown's social functioning and/or interaction. Therefore, this evidence is material.

---

**15.** It should be noted that although the ALJ ruled that there are a significant number of jobs in the national economy that Brown could perform, including Final Inspector, Call–Out Operator, and Laminator 1 (Tr. 27), nowhere in the record is there any evidence or testimony to support this conclusion.

When questioning the VE, the ALJ merely asked for three examples of "unskilled." The ALJ did not ask, and the VE did not testify, whether Brown was capable of performing the occupations the VE listed in response to the ALJ's generic question.

■ There is also a reasonable probability that this new evidence would have affected the outcome of the Commissioner's decision. The psychiatric evaluation conducted while Brown was at Bayshore indicates that Brown has a long history of bipolar disorder, evidenced by multiple suicide attempts. Brown had not been diagnosed with bipolar disorder prior to the hearing, and such a disorder would require the ALJ to make a disability evaluation based upon a different disease, signs, symptoms, and prognosis. Additionally, it may well be determined that Brown is more significantly impaired in the area of social functioning and/or interaction. It appears that Brown may well be found to meet Listing 12.04 should the post-hearing evidence, elucidating a pre-hearing condition, be considered. Finally, there is good cause for the failure to include this evidence in the initial proceedings as it simply did not exist at the time of the hearing and Brown had been diligent in seeking treatment for his psychiatric condition prior to the hearing.[16]

### IV. The ALJ Erred in Failing to Consider Side Effects From Brown's Multiple Medications In Credibility and RFC Assessments

■ SSR 96–7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements. See also 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv). Pursuant to SSR 96–8p, the RFC assessment "must be based on all of the relevant

evidence in the case record," including "the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Brown is required to take a large number of medications, including antidepressants and anti-anxiety agents. Drowsiness and dizziness are listed among their common side effects.[17] The record documents that Brown complained of drowsiness and dizziness on several occasions. (R. 147, 195, 197 and 208). Accordingly, an evaluation of medication side-effects and any impact on Brown's RFC would have been appropriate in this case and the ALJ erred by failing to make such an evaluation. Contrary to the Commissioner's contention, the fact that Brown did not specifically refer to his symptoms as "medication side effects" when he complained of them should not negatively reflect upon his credibility. To the extent the ALJ's analysis of Brown's credibility hinged on this issue, the ALJ's analysis was in error. It is entirely unreasonable to expect that a layman such as Brown should be required to determine that his symptoms are, in fact, due to "medication side effects" and report them specifically as such. The fact that he complained of the symptoms alone is sufficient. Upon remand, the effect of medication side-effects should be considered in evaluating Brown's credibility and RFC.

■ Brown's contention, however, of error concerning his alleged tinnitus and fibromyalgia must finally be addressed. There must be a showing of functional impairment resulting from the alleged con-

---

**16.** With respect to the subsequently submitted records from Dr. John Adams, (R. 277–278), Brown failed to make the requisite showing to warrant post-hearing consideration. Although Dr. Adams' November 16, 2000 report is dated after the hearing, it is for the most part duplicative of his October 13, 1999 re-

port, which pre-dated the hearing, and for which no showing of good cause for failure to provide such a report during the proceedings has been made.

**17.** See generally Physician's Desk Reference 2555–6, 2760 (55th Ed.2001).

dition that precludes substantial gainful activity. *Harper v. Sullivan,* 887 F.2d 92, 97 (5th Cir.1989). Here, there is no evidence of record that the alleged conditions would limit Brown's ability to perform a limited range of sedentary work. Further, even if there was a showing of functional impairment resulting from the alleged tinnitus or fibromyalgia precluding substantial gainful activity, Brown has failed to show how he was prejudiced by the ALJ's failure to consider the alleged conditions. The Fifth Circuit will not reverse the decision of an ALJ for lack of substantial evidence where the claimant made no showing that he was prejudiced by the deficiencies he alleges. *Brock v. Chater,* 84 F.3d 726, 729 (5th Cir.1996).

## CONCLUSION

A review of the entire record, reveals that the ALJ applied the correct legal standard, but his decision to deny benefits was not supported by substantial evidence. It is **RECOMMENDED** the Commissioner's decision be **REVERSED** that this case be **REMANDED** to the Commissioner pursuant to "sentence four" of section 405(g) for rehearing to (1) obtain an analysis of Brown's mental residual functional capacity from a competent psychiatrist who has reviewed all of Brown's medical records contained in the record including, but not limited to, the Bayshore Hospital records; (2) evaluate Brown's disability and RFC in light of medication side-effects; and (3) obtain a competent and credible evaluation of the availability and existence of jobs in the national and local economy that Brown can perform in light of all his limitations, physical and mental, should this issue continue to remain relevant following the additional disability evaluation that the ALJ is to conduct. It is further

**RECOMMENDED** that Brown's Motion for Summary Judgment (Entry # 10) be **GRANTED** and the Commissioner's Motion for Summary Judgment (Entry # 11) be **DENIED.**

The Clerk shall file this Memorandum and Recommendations and provide all parties a true copy. The failure to file written objections to the proposed findings and recommendations within ten (10) days of the entry of this Memorandum and Recommendations, may bar an aggrieved party, except upon grounds of plain error, from attacking the proposed factual findings and legal conclusions, on appeal. See *Acuna v. Brown & Root, Inc.,* 200 F.3d 335, 340 (5th Cir.2000); *Douglass v. United Services Automobile Assoc.,* 79 F.3d 1415, 1424 (5th Cir.1996)(*en banc*); see also *Crawford v. Falcon Drilling Co., Inc.,* 131 F.3d 1120, 1123–4 (5th Cir.1997); and, 28 U.S.C. § 636(b)(1)(C).

May 16, 2003.