# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 23, 2026

Lyle W. Cayce
Clerk

———————

No. 24-40704

———————

GREG MURPHY, *individually and on behalf of all others similarly situated*,

*Plaintiff—Appellant*,

*versus*

BEAUMONT INDEPENDENT SCHOOL DISTRICT; SHANNON ALLEN,

*Defendants—Appellees*.

———————————————————————

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 1:22-CV-135

———————————————————————

Before GRAVES and DUNCAN, *Circuit Judges*.[*]

PER CURIAM:[**]

Greg Murphy appeals the district court's grant of summary judgment to Beaumont Independent School District and its superintendent in his civil rights action stemming from the application of a premium pay policy during

———————————————

[*] Judge James Dennis was a member of the panel assigned to this case but took inactive status after the case was submitted. This case is decided by a quorum under 28 U.S.C. § 46(d).

[**] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

the start of the COVID-19 pandemic. For the reasons stated below, we VACATE the grant of summary judgment in part on Murphy's substantive and procedural due process claims, AFFIRM in part on his other claims, and REMAND.

## FACTS AND PROCEDURAL HISTORY

Greg Murphy was hired by Beaumont Independent School District (BISD) on January 7, 2019, as a carpenter in the maintenance department. On August 16, 2019, BISD passed a policy on Premium Pay During Disasters. In March of 2020, schools and other businesses began closing due to the COVID-19 pandemic. BISD closed its buildings and offices to the public from March 24 until May 28, 2020, but all employees were asked to continue working to support remote educational services and meal distribution to students during the time of modified operations. Some employees continued to report to work at BISD buildings, and BISD took steps to deep clean those buildings. Murphy was among the employees required to report to work at BISD buildings during this period.

When the decision was made to close buildings to the public during the pandemic, the BISD Board of Trustees also passed a resolution delegating various decision-making authority to the Superintendent of BISD, Shannon Allen, "in response to the declarations of emergency." Those decisions included the payment and scheduling of employees. The board also delegated to Allen the authority "to implement the provisions of Board Policy DEA (Local)." Pursuant to this authority, Allen decided that premium pay would be paid only to nonexempt employees who engaged in work that required consistent, prolonged exposure to the public during the modified operations. In doing so, Allen determined that prolonged exposure to the public would determine the applicability of premium pay rather than whether the employee held an essential job. Thus, Allen determined that

No. 24-40704

Murphy, as a carpenter, did not qualify for premium pay. However, Murphy believed the determination contradicted the premium pay policy established before the pandemic.

In June of 2020, an internal grievance was filed on behalf of the Beaumont Teachers Association seeking retroactive "enhanced COVID-19 pay." Other employees also began filing grievances. Murphy filed his grievance on July 8, 2020, requesting premium pay for the period of March 23, 2020, through May 28, 2020. On December 2, 2020, Allen executed a Resolution and Release agreeing to settle the claims by paying each grievant $819.06. Murphy rejected the settlement and did not deposit the check. Murphy said that he calculated he was owed $4,278 in premium pay for the period in question. Murphy also said that Allen was supposed to keep track of the hours to calculate the premium pay owed to him.

Thereafter, Murphy circulated a petition collecting signatures of coworkers to initiate legal action against BISD. Murphy asserts that the petition was seen by Derwin Samuels, the BISD Executive Director for Human Resources, and Allen. Murphy also asserts that in July and August of 2021, he had made repeated inquiries about overtime opportunities that only certain workers were getting despite being advertised to everyone, and he had attempted to convince his supervisor and others to assign some overtime to him and his coworkers. He also said he had been assigned overtime before he filed a grievance.

Murphy asserts that BISD started a campaign of retaliation against him after learning of his efforts to initiate legal action. On August 13, 2021, BISD's Assistant Director of Maintenance issued Murphy a notice of misconduct based on "poor work performance." The notice specifically indicated that Murphy spent 33 hours assembling ten media carts which BISD says "was substandard for a competent craftsman." Murphy asserts

3

that nobody else had assembled media carts to determine what amount of time was reasonable for him to assemble them. Murphy filed a Level I grievance requesting that the misconduct notice be removed from his file. On September 15, 2021, Allen Devault, BISD's Director of Maintenance and Operations who served as the Level I hearing officer, issued a decision denying Murphy's request. Murphy appealed that decision. The Level II hearing officer, BISD Human Resources Manager Brandon Basinger, affirmed the Level I decision.

On February 2, 2022, Devault said that he received information from Donald "Ben" Chenault that another employee, Chad Thomas, had told him that Murphy made a threat to blow up BISD's Maintenance Department by strapping a bomb to a remote-control car. BISD argues that BISD Police Officer Shanter Norman met with several witnesses who confirmed what Murphy said. Murphy denies making a threat to bomb the maintenance department. He asserts that he was arrested based on the unsubstantiated statement of Thomas. He asserts that Chenault merely repeated what Thomas said and did not allege that he heard Murphy say anything. Murphy asserts that Thomas' statement was a "false mischaracterization" of a conversation he had in the breakroom during Black History Month about his childhood experiences in Birmingham and the bombing of a church during the civil rights movement. However, Murphy's assertion is not supported by the record, which indicates that multiple other employees confirmed to Norman that Murphy said something to the effect of what Thomas alleged. One employee said Murphy was talking in a joking manner about work, but others mentioned a remote-control car and a bomb or other threatening language.

As a result of that incident, Murphy was arrested on February 9, 2022, for making a terroristic threat. Murphy was placed on administrative leave without pay while the matter was investigated. BISD asserts that Murphy

failed to cooperate in the investigation. Murphy asserts that, after he was arrested and placed on administrative leave without pay, he told the district to contact him through his attorney. The record confirms that Murphy mentioned his attorney to at least one person but her statement indicated that "Murphy stated that he would not speak to anyone at Beaumont ISD and would be contacting his attorney."

Following the investigation, Basinger found that Murphy had violated district policy and the Educator's Code of Ethics, and he recommended that Murphy be terminated. On March 12, 2022, Murphy was terminated purportedly for making a threat to blow up the maintenance department and refusing to cooperate with an investigation.

Following his termination, Murphy filed suit under 42 U.S.C. § 1983 on March 31, 2022, alleging that BISD and Allen (collectively "BISD" or "the district") had violated various constitutional rights. Murphy's third amended complaint specified that the defendants violated the following: 1) his substantive due process rights by arbitrarily and capriciously denying his request for premium pay; 2) his procedural due process rights by depriving him of a protected property interest without proper procedural safeguards in place; 3) his First Amendment rights by retaliating against him for speaking out against BISD and organizing legal action; and 4) his Fourth Amendment right to be free from malicious prosecution by arresting him based on a fabricated bomb threat. The defendants answered, and Allen asserted qualified immunity. On September 25, 2024, the district court granted summary judgment to the defendants. Murphy appealed.

## STANDARD OF REVIEW

A district court's evidentiary rulings on summary judgment are reviewed for an abuse of discretion. *Ratliff v. Aransas Cnty., Tex.*, 948 F.3d 281, 286 (5th Cir. 2020). Once the summary judgment record is defined, this

5

court reviews a district court's grant of summary judgment de novo, viewing all evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Id*. at 286-87; *see also Wilson v. City of Southlake*, 936 F.3d 326, 329 (5th Cir. 2019). Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## DISCUSSION

### * *Substantive and Procedural Due Process*

Murphy asserts that the district court erred in granting summary judgment on his substantive and procedural due process claims.

Section 1983 liability attaches to a local governmental entity pursuant to the elements set out in *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978). As this court has reiterated, "municipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (quoting *Monell*, 436 U.S. at 694). "Municipal liability for section 1983 violations results if a deprivation of constitutional rights was inflicted pursuant to official custom or policy. Official policy is ordinarily contained in duly promulgated policy statements, ordinances or regulations." *Piotrowski*, 237 F.3d at 579.

The district court held that Murphy sufficiently established a policymaker and an official policy under the first two elements of *Monell*, 436 U.S. 694, for his substantive and procedural due process claims. We agree.

However, the district court then found that Murphy was unable to establish a genuine dispute of material fact as to whether he suffered a constitutional violation under the third element of *Monell* because he had no protected property interest. We disagree.

Specifically, Murphy asserts that he possessed a protected property interest in premium pay during the COVID-19 pandemic pursuant to BISD policy. Murphy, like the district court, cites *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972), for the proposition that property interests protected by the Due Process Clause are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Further, that he must demonstrate "a legitimate claim of entitlement" to the benefit to establish a protected property interest. *Id.*; *see also Bishop v. Wood*, 426 U.S. 341, 344 n. 6 (1976).

Murphy asserts that BISD policy creates a protected property interest. He is correct. BISD adopted a Premium Pay During Disasters policy, as follows:

> Nonexempt employees who are required to work during an emergency closing for a disaster, as declared by a federal, state, or local official or the Board, *shall* be paid at the rate of one and one-half times their regular rate of pay for all hours worked up to 40 hours per week. Overtime for time worked over 40 hours in a week *shall* be calculated and paid according to law. [See DEAB] The Superintendent or designee *shall* approve payments and ensure that accurate time records are kept of actual hours worked during emergency closings.

(Emphasis added). Murphy asserts that he was a nonexempt employee who was required to work during an emergency closing because of a disaster.

BISD argues that the district did not undergo an emergency closure for a disaster pursuant to board policy. Instead, BISD asserts that the district engaged in a period of modified operations as a result of the COVID-19 pandemic. BISD says that, even though buildings and offices were closed to the public, several BISD employees continued to report to their assigned work locations a minimum of five hours a day. BISD also says that employees were then compensated for a full eight-hour day. BISD argues that the "period of modified operations during the COVID-19 pandemic differed from prior weather-related emergency closures where no operations took place for some period of time. . . . Conversely, during COVID-19, the [d]istrict remained open to employees and continued to operate, albeit in a modified capacity, to ensure instructional continuity and meal distribution to students." The district court essentially agreed.

The district court also cited *James v. Cleveland School District*, 45 F.4th 860, 866 n.3 (5th Cir. 2022), for the proposition that a policy does not create a constitutionally protected entitlement if government officials have the discretion of whether to grant or deny it under the policy. The district court relied on Texas Education Code and the Texas Supreme Court to find that "Murphy must produce evidence that BISD's Board has interpreted the phrase 'an emergency closure' to encompass the procedure implemented by BISD in response to COVID-19." (citing Tex. Educ. Code § 11.151(b); *Davis v. Morath*, 624 S.W.3d 215, 224 (Tex. 2021)). The district court found that Murphy does not cite any evidence regarding BISD's interpretation. We disagree for multiple reasons, including the fact that Murphy does cite such evidence.

BISD's argument that the premium pay policy did not kick in for COVID-19 because it was a period of modified operations unlike "prior weather-related emergency closures where no operations took place for some period of time" fails to account for the fact that its own premium pay policy

explicitly requires that *some* operations take place, i.e., nonexempt employees being required to work. (Emphasis added). Also, there is a separate Pay During Closing policy provision that provides, in relevant part: "During an emergency closure, all employees shall continue to be paid for their regular duty schedule" which would seem to apply in a scenario such as the "prior weather-related emergency closures where no operations took place" example. Moreover, BISD's argument is rebutted by evidence that BISD indeed paid numerous employees premium pay during the COVID-19 closure. If it was not an "emergency closure" for purposes of the premium pay policy, then it would not have been an "emergency closure" for all employees, and nobody would have been entitled to premium pay. The record indicates that numerous employees across BISD were receiving premium pay, although a few employees turned it down for various reasons such as receiving Social Security. Additionally, email exchanges about who would receive premium pay were occurring within days of the buildings being closed to the public because of COVID-19 and long before any grievances were filed by Murphy or anyone else.

BISD asserts that because Murphy was not a nonexempt employee whose job required consistent, prolonged exposure to the public during the period of modified operations, he did not have a protected property interest in premium pay pursuant to BISD policy. But Murphy was a nonexempt employee who was required to work during the closure, and the established policy said nothing about "consistent, prolonged exposure to the public." Also, there is no evidence that BISD delegated any authority allowing Allen to amend the existing policy. As quoted previously, it delegated the authority for her "to implement" the existing policy, which said nothing about consistent, prolonged exposure. Further, the language used throughout the premium pay policy did not allow for discretion, as quoted above herein. Instead, the provision requires that employees be paid by the use of "shall."

Again, BISD interpreted that very provision to allow for the payment of premium pay for other employees during COVID.

The district court deferred to BISD's interpretation of the policy, citing *Davis*, 624 S.W.3d at 224 and *Montgomery Independent School District v. Davis*, 34 S.W.3d 559, 565 (Tex. 2000). In response, Murphy argues three points: 1) BISD's interpretation was not contemporaneous with the events in question but was developed after grievances were filed; 2) deferring to BISD's interpretation would allow the district to redefine the terms of its policy after employees had already performed the work based on an expectation of premium pay; and 3) the policy uses mandatory language, i.e., "shall be paid," and explicitly refers to "disaster" declarations and "emergency closing," both of which happened here.

Murphy also asserts that he was denied procedural and substantive due process for various reasons, including that he was not informed he would not receive premium pay until after he had already worked, he was not provided a meaningful opportunity to be heard, the settlement offer was substantially less than he was owed, and BISD's actions were arbitrary and capricious. He points out that there is no meaningful distinction between the workers who received premium pay and workers such as himself. Murphy offers more than enough to overcome summary judgment at this stage.

Because Murphy is able to establish a genuine issue of material fact of a protected property interest and a constitutional violation, we vacate the grant of summary judgment on his substantive and procedural due process claims.

*\* First Amendment and Fourth Amendment claims*

Murphy asserts that the district court improperly granted summary judgment on his First Amendment retaliation and Fourth Amendment malicious prosecution claims by incorrectly finding that he failed to establish

municipal liability under *Monell*, 436 U.S. at 694. The district court found that Murphy failed to identify any policy or custom as the moving force behind either claim. The district court then concluded that summary judgment was proper on the claims because there was insufficient evidence to create a fact issue regarding the existence of a pattern of unconstitutional conduct. We agree.

The First Amendment applies to states through the Due Process Clause of the Fourteenth Amendment. *See DeJonge v. Oregon*, 299 U.S. 353, 364 (1937). Generally, "the First Amendment prohibits not only direct limitations on speech but also adverse government actions against an individual" exercising his right. *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1999). "[T]he government may not place conditions on public benefits, including jobs, that penalize applicants for their speech, beliefs, or association." *Id.* This includes dismissals for "speaking on 'issues of public importance.'" *Id.* at 508-09 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574-75 (1968)). This court has concluded that false accusations, verbal reprimands, and investigations are not actionable adverse employment actions. *Colson*, 174 F.3d at 511. But formal reprimands and terminations are actionable. *Id.*

In relevant part, to establish a First Amendment retaliation claim, Murphy must show that he was engaged in a protected activity, BISD's actions caused him to suffer an injury that would chill an ordinary person from continuing to engage in that activity, and that BISD's actions were substantially motivated by his exercise of constitutionally protected conduct. *See Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). Murphy asserts that he was speaking on issues of public importance and that BISD retaliated because he was circulating a petition regarding premium pay. But he also vaguely alleges other claims, such as the overtime issue, or his discussion during Black History Month. However, even presuming that he establishes

a protected activity and an injury, he is unable to establish that BISD's actions were substantially motivated by his exercise of constitutionally protected conduct because the record reveals evidence to establish a legitimate reason for the single notice of misconduct and, more importantly, for his arrest and termination.

Further, "a criminal prosecution in retaliation for the exercise of First Amendment rights must satisfy the standards of malicious prosecution." *Id.* at 257 (citing *Colson*, 174 F.3d 498, 513 n.8 (5th Cir. 1999)). "One of those standards is an absence of probable cause to prosecute." While the prosecutor eventually dismissed the charges against Murphy, the dismissal was based on insufficient evidence to prove the case beyond a reasonable doubt, not on the lack of probable cause. There are witness statements in the record sufficient to justify Murphy's arrest and termination. Thus, he is unable to establish that BISD retaliated against him for the exercise of his rights or engaged in malicious prosecution.

Murphy also disagrees with the district court's decision to strike some of his evidence. In response to the defendants' motion for summary judgment, Murphy submitted a declaration from Shanter Norman, the officer who arrested him. The defendants moved to strike the declaration, and the district court sustained objections to the following paragraphs:

> 5. In hindsight given the facts recited to me at the scene of the arrest by Mr. Murphy, it is clear to me the district retaliated against Mr. Murphy in violation of his First Amendment Rights. Since Mr. Murphy's arrest I have also been the victim of 1st Amendment Retaliation by the District.
>
> 6. This conduct by the District, based on my years of experience with BISD, is a pattern and practice of retaliatory treatment of employees by the district that speak on matters of public concern.

12

Murphy asserts that the district court abused its discretion in excluding Norman's declaration, as it improperly deprived him of critical evidence that would have created genuine issues of material fact on his First Amendment retaliation and malicious prosecution claims. However, as BISD argues, the district court did not strike the entire declaration. Further, these paragraphs do not say enough to overcome the other evidence even if they had been admitted. Also, while this declaration is consistent with Murphy's arguments, Norman does not say anything that raises definitive questions about the validity of his own investigation. Thus, Murphy is unable to establish an abuse of discretion. *See Ratliff*, 948 F.3d at 286.

For these reasons, the district court properly granted summary judgment on Murphy's First Amendment retaliation and Fourth Amendment malicious prosecution claims.

*\* Qualified immunity*

Murphy asserts that the district court erred in granting summary judgment to Shannon Allen on the basis of qualified immunity.

When a defendant moves for summary judgment on the basis of qualified immunity, the court must decide: 1) Whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right; and 2) whether that right was "clearly established" at the time of the defendant's alleged misconduct so that a reasonable official in the defendant's situation would have understood that his conduct violated that right. *See Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014).

Murphy asserts that the district court failed to consider the facts in the light most favorable to him and improperly granted qualified immunity. More specifically, Murphy asserts that his legitimate claim of entitlement was clearly established in *Roth*, 408 U.S. at 577.

No. 24-40704

BISD asserts that the district court correctly found that Allen was entitled to qualified immunity because Murphy failed to demonstrate any constitutional violation or that any action was taken that violated his rights.

The district court found that "Murphy's claims against Allen must also fail as there is no evidence of a constitutional violation. Thus, the court need only consider whether summary judgment is appropriate." But, as discussed above, there is evidence of a constitutional violation. The question of whether the right was clearly established is the relevant consideration.

In *Roth*, David Roth was hired for his first teaching job as an assistant professor at Wisconsin State University-Oshkosh for a fixed term of one academic year. *Id.* 408 U.S. at 566. He completed the term but was not rehired for the next academic year. *Id.*

In Wisconsin, a state university teacher can acquire tenure as a permanent employee after four years of year-to-year employment. Upon acquiring tenure, a teacher is entitled to continue employment. But a new teacher is entitled to nothing beyond a one-year position. The decision of whether to rehire a nontenured teacher is left to "the unfettered discretion of university officials." *Id.* at 567.

Roth brought an action alleging the deprivation of his Fourteenth Amendment rights in violation of free speech based on his criticism of the university and due process because the university failed to advise him of the reasons for its decision. *Id.* at 568. The district court granted partial summary judgment for Roth on the procedural issue and ordered the university to provide him with reasons and a hearing. *Id.* at 569. The Court of Appeals affirmed. *Id.* The Supreme Court granted certiorari to answer the question of whether Roth had a constitutional right to a statement of reasons and a hearing on the university's decision not to rehire him. The Court held that he did not. *Id.* In reversing and remanding, the Supreme

Court held that where there was no statute, rule, or policy that secured his interest in reemployment or that created a legitimate claim to it, Roth did not have a property interest protected by the Fourteenth Amendment. The Court also discussed the fact that the state did not make any charge against Roth that might seriously damage his standing and associations in the community. The Court also said that "[t]here might be cases in which a State refused to re-employ a person under such circumstances that interests in liberty would be implicated. But this is not such a case." *Id.* at 573.

While *Roth* is sufficient for its statements of law, it is not sufficiently on point for purposes of demonstrating a clearly established right in that Allen would have known or reasonably should have known that her conduct violated that right, particularly during the confusion and anxiety of the COVID-19 pandemic. Murphy fails to provide authority sufficient to overcome Allen's qualified immunity.

For the reasons stated above, we VACATE in part, AFFIRM in part, and REMAND for further proceedings consistent with this opinion.